Filed 8/25/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S045696 |
| v. | ) | |
| | ) | |
| RANDY EUGENE GARCIA, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA077888 |
| _____ | ) | |

A Los Angeles jury found defendant Randy Eugene Garcia guilty of crimes stemming from two home invasions committed the night before Mother's Day, 1993, in the same neighborhood in Torrance. The most serious incident, in which the victims — a married couple with children — were home during the burglary, resulted in convictions for the first degree murder of Joseph Finzel (Pen. Code, § 187, subd. (a)),[1] and the attempted premeditated murder of his wife, L. (§§ 187, subd. (a), 664.) Related convictions involved burglary (§ 459), robbery (§ 211), attempted forcible rape (§§ 261, subd. (a)(2), 664), and forcible oral copulation (§ 288a, subd. (c)). The jury also sustained special circumstances providing that the Finzel murder occurred in the commission of burglary, robbery, attempted rape, and oral copulation. (§ 190.2, subd. (a)(17).) Additional findings were that

---

[1] All further statutory references are to the Penal Code except as otherwise stated.

1

defendant was armed with and personally used a handgun (§§ 12022, subd. (a)(1), 12022.5, subd. (a)), and that he personally inflicted great bodily injury on L. (§ 12022.7).  In the other incident charged in this case, defendant was convicted of burglarizing the home of a second couple, the Kozaks, who were vacationing out of town at the time.  (§ 459.)

After a penalty trial, the jury fixed the penalty at death.  The trial court declined to grant a new trial (§ 1179 et seq.), and denied the automatic motion to modify the death verdict (§ 190.4, subd. (e)).  The court pronounced a death judgment for the special circumstance murder.  Sentence also was imposed and stayed on the noncapital felony counts, including life with the possibility of parole for attempted murder.  This appeal is automatic.  (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We find no prejudicial error at defendant's trial.  The judgment will be affirmed in its entirety.

## I.  GUILT EVIDENCE

### A.  Prosecution Case

### 1. *Events Surrounding the Charged Crimes*

On May 8, 1993, the day before Mother's Day, defendant and his friend, Edward "Bruce" Pierce, drove in Pierce's car from Portland, Oregon to Torrance, California.  In Torrance, they planned to stay with George Aguirre, another friend of defendant's, and to buy marijuana for sale later in Oregon.  Pierce testified at trial that the trio sampled "Mexican weed" in Aguirre's apartment that day.  Aguirre confirmed this account.

According to Pierce and Aguirre, defendant announced between 9:00 and 10:00 that night that he wanted to do "a job," meaning he wanted to steal something.  Aguirre offered to drive defendant, using Pierce's car.  Defendant put

2

on a black turtleneck shirt, and wore jeans and black Nike shoes. He also carried a fanny pack around his waist. The fanny pack contained a small chrome handgun and a pair of black gloves.

A short time later, Aguirre dropped defendant off about one mile from the apartment. Aguirre waited 15 minutes and then drove home. On the way, he saw defendant walking on the street, carrying something he did not have before — a multicolored leather-like bag that closed with a rope. Defendant entered the car and said the bag held "a bunch of change."

Aguirre drove several blocks and defendant exited the car again, leaving the bag behind. This time, he jumped over a wall at a dead end on 180th Street.

Aguirre went home with an uneasy feeling, arriving no more than one hour after he left with defendant. There, Aguirre spoke with Pierce about "cops all around." Pierce said he would leave for Oregon alone if defendant did not return to the apartment by 3:30 a.m.

### 2. *The Kozak Burglary*

Prosecution evidence established that between the time defendant first left the car and the time Aguirre saw him carrying the multicolored bag of "change," defendant burglarized a nearby home belonging to Archie and Winona Kozak. The Kozaks had locked the house and left for Las Vegas on May 6, 1993. Mrs. Kozak testified that when they returned late on May 9, Mother's Day, the house had been ransacked. The police found no fingerprints — only glove marks and fabric particles.

Various items were missing, including jewelry, collectable coins, and a multicolored bag that pulled closed on top. Mrs. Kozak identified these items at trial. As we discuss below, they were found, along with other stolen property, in defendant's possession in Oregon, where he was arrested a few days after the charged crimes.

3

### 3. *The Finzel Crimes*

Around 11:15 p.m. on May 8, 1993, L. was in the master bedroom of her home on 180th Street, not far from where Aguirre last saw defendant exit the car and jump over a wall.  L. was dozing in bed, after having turned the lights off and left the bedroom television set on.  The window blinds were closed.  L. testified, however, that anyone standing in the backyard could see into the bedroom through gaps in the blinds.

L.'s husband, Joseph, was socializing elsewhere with a friend and was expected to return home soon.  The only other person in the house was the couple's infant daughter, Brinlee, who was sleeping in a bassinet at the foot of the bed near L.  Joseph's son from a prior marriage, Garrett, lived with the Finzels, but was spending time elsewhere with his mother.

Awakened by a banging noise, and sensing movement nearby, L. looked up and saw defendant standing in the doorway, holding a small silver gun.  She positively identified him at trial.  His face was clearly visible in the available light.

Without warning, defendant grabbed the bassinet and told L. not to scream because he had an armed accomplice outside, and because he would "hurt the baby."  Defendant wore dark clothes, black gloves, and a fanny pack.  He carried a pack of Camel cigarettes in his pants pocket and smelled of cigarette smoke.[2]

In the first of two such episodes, defendant forced L. to engage in sex acts. He made her remove her shorts and orally copulate him while she sat on the bed. He then told her to stand and insert his penis into her vagina from behind.  She tried to comply but could not do so, because he did not have an erection.  When he asked if "it [was] in," she said "yes."

---

[2]    Aguirre testified that defendant smoked cigarettes, and that he had Camels in his possession on May 8, 1993.

4

Next, defendant grabbed L.'s arm and took her into the hallway. There, he opened the door of Garrett's bedroom, and was told by L. that the room belonged to her stepson, who was not home. When they returned to the master bedroom, defendant told L. to remove her shirt and expose her "titties." He attempted a second act of sexual intercourse from behind. As before, L. pretended to place his penis, which was not erect, into her vagina. Throughout the ordeal, defendant either held the gun in his hand or placed it visibly within his reach on the bed.

According to L., subsequent events became more frenetic and deadly. Defendant demanded access to the "money," "jewelry," "safe," and "gun." L. said there was no money or safe, but told him where to find her gold watch and jewelry. She also said that her wallet and credit cards were located in Brinlee's diaper bag. Though L. sought to prevent defendant from finding her husband's .357 Magnum handgun, and falsely said it was not on the premises, defendant nonetheless found the weapon in a bedroom drawer. At that point, he stuffed a sock into L.'s mouth and tied a pillowcase around the gag. He also used a pair of nylons to bind her wrists and feet together behind her back.

Defendant then shifted his focus and asked L. about her husband's whereabouts. L. indicated (once her gag was loosened) that Joseph was at a local restaurant. Defendant partially closed the bedroom door so that only a five-inch opening remained. The next thing L. heard was Joseph's truck outside the house. She estimated the time at 11:30 p.m.

Once inside, Joseph opened the bedroom door, turned on the light, and looked at L. lying bound and nude on the bed facing him. Defendant stood slightly behind her, apparently holding the .357 Magnum pistol in his hand. Suddenly, Joseph and L. each screamed, followed by gunfire. L. saw blood flowing from Joseph's abdomen, and then felt pain in her stomach and arm. She too had been shot. Defendant fled the room as L. begged him not to "leave us like

5

this." Brinlee cried in her bassinet. L. testified that defendant shot across and over the baby to hit Joseph.

Defendant stayed in the Finzel home for two or three hours after the shootings. He reentered the master bedroom three times. First, he disabled the phone when L. tried to dial 911. The second time, as she pretended to be dead, he tapped her on the head. During his third visit, he raised and then dropped L.'s arm, saying "she's dead." Meanwhile, according to L., she pressed down on her bullet wounds to slow the bleeding. The bed — a waterbed — was leaking. She moved her head to prevent water from entering her nose.

By the time defendant left the house, L. had loosened the nylon wrist ties and pulled the gag away from her face. Dizzy and weak, she crawled over her husband, and stumbled through the house and yard to the neighbor's porch. She knocked on the door and collapsed.

The neighbors, the Nevilles, testified that they heard noises, possibly gunshots, around 11:00 p.m., and found L., nude and bleeding, on their porch around 2:00 a.m. She told them about the robbery and shooting, and about Brinlee and Joseph next door. The Nevilles called 911.

When police and paramedics arrived a short time later, L. was in shock and near death. She was rushed to the hospital. At the Finzel home, Joseph was found dead on the bedroom floor, his body partially blocking the door. His pants pockets had been turned inside out. Brinlee was unharmed. Her bassinet was resting on Joseph's leg, between his feet.

4. *Investigation of the Murder Scene*

The Finzels' home, which was neat before the crimes, was in disarray afterwards. Torrance police officers found cabinets, closets, and drawers open in various rooms. L.'s purse was on the living room floor, its contents strewn nearby. The back door stood ajar. A diaper bag was in the backyard. Gates in a

6

side yard were open. One set of car keys was found on the ground near the garage. Another set was in the ignition of the Finzels' Corvette. The car battery was dead.

The investigation disclosed that a bullet fired from inside the master bedroom passed through the door and became lodged in a living room cabinet. Two expended bullets rested on or near the bed. In the hallway near the master bedroom, the police tested for fingerprints, and found only glove marks. There were two Camel cigarette butts — one on the back porch, and the other at the rear of the property, near footprints and crushed weeds.

Property missing from the Finzels' home included L.'s gold watch and other jewelry, and Joseph's truck. Police later found the truck parked near Aguirre's apartment, where defendant was staying at the time. Credit cards belonging to the Finzels were found inside the truck. Police retrieved a Camel cigarette butt from beneath the driver's door.

5. *Defendant's Return to Aguirre's Apartment*

Between 3:00 a.m. and 3:30 a.m., Aguirre and Pierce heard defendant enter the apartment. Defendant said he was "going straight to hell." Aguirre recalled defendant also saying that he "shot two people," while Pierce thought that the word "killed" might have been used. Defendant displayed a .357 Magnum handgun, attributed it to his "second job," and expelled empty casings onto the floor. He was carrying a woman's purse and another cloth bag. He dumped jewelry from the purse onto a coffee table.

Defendant and Pierce left for Oregon the same night, leaving by 4:00 a.m. Aguirre testified that he declined defendant's request to dispose of the .357 Magnum handgun. Hence, defendant included the gun in the items he packed for the trip. He also took the woman's purse, jewelry, and the .25-caliber gun that he carried in his fanny pack. Pierce testified that defendant tossed the purse onto a

7

Los Angeles freeway. He kept the other items. They included a gold watch, which defendant put in the glove compartment of Pierce's car.

### 6. *Aguirre's Cooperation with Police*

While watching a television newscast on May 9, Aguirre realized that defendant might be linked to the Finzel crimes. He contacted the Torrance Police, and began cooperating with the lead investigators, Detectives Mason and Nemeth. Though reluctant to admit he had driven defendant around town the night of the crimes, Aguirre gave police all relevant information and physical evidence in his possession. Such items consisted of those left in Aguirre's apartment by defendant when he departed for Oregon, including bullets and expended casings, black clothing items (turtleneck shirt, gloves, and Nike shoes), and Camel cigarettes.

### 7. *Defendant's Return to Oregon*

While driving with Pierce to Oregon in the early morning hours of May 9, defendant described the shootings that he had admitted before to both Pierce and Aguirre. Defendant said he shot the male victim because he saw defendant's face, and that he shot the female victim because she "freak[ed] out." In Oregon, defendant gave the .357 Magnum handgun to Pierce. Pierce gave it to his mother.

On May 10, defendant contacted his friend, Antoin Jackson, in Oregon, and stayed overnight at Jackson's house. On May 11, defendant communicated with someone by page and phone. Afterwards, he seemed nervous, and made incriminating statements to Jackson. Defendant said he was going "to hell" and to prison for "life" because he had "killed someone." The victims were a "bitch" who "scream[ed] too loud", and a man who "walked in" while defendant was burglarizing a house. Defendant told Jackson that he stayed in that house for "a few hours," and was "real high" at the time. Defendant identified the murder

8

weapon as the .357 Magnum handgun he gave to Pierce, and admitted trying to steal a car during the crime.

Meanwhile, on May 11, sheriff's detectives in Washington County, Oregon learned that an arrest warrant had issued in the present case, and that the Torrance Police sought help in apprehending defendant. Hence, that same day, the Oregon detectives contacted Pierce, who cooperated in the investigation. Pierce disclosed defendant's incriminating statements. Pierce also helped retrieve the gold watch and the .357 Magnum handgun he had obtained from defendant. All such evidence was given to the lead investigators in Torrance.

Through Pierce, Oregon detectives contacted defendant's friend, Suely Caramelo. She gave them items she had received from defendant after his Torrance trip — items that were given, in turn, to the Torrance Police. They included a woman's gold and diamond ring and a multicolored cloth bag with coins inside. Caramelo also said that defendant was at Jackson's house.

Defendant was arrested a short time later at Jackson's house. Items found in his possession included a fanny pack with a small chrome pistol inside, and a bag of jewelry. Defendant was wearing a gold and diamond ring at the time.

After being told about the murder warrant in Torrance, and read his *Miranda* rights (see *Miranda v. Arizona* (1966) 384 U.S. 436), defendant remarked that he was the "wrong guy," that he became involved with the "wrong people," and that they had "threatened" him. During the drive to the sheriff's station, defendant made similar statements that "four Mexican gang members" forced him to "take the gun and jewelry" near the spot where "two people" were killed. Defendant denied knowing anything about the victims, including gender, and could not explain how Pierce and Aguirre might have acquired such information. When told that the female victim had survived and identified him as the lone intruder, defendant turned pale, breathed deeply, and said, "Shit."

9

**8.** *Physical Evidence*

Property recovered in Oregon had been stolen not only during the Kozak burglary, as noted above, but also during the capital crime. The ring defendant wore when arrested was Joseph Finzel's wedding ring. It was on Joseph's finger when he was shot. The ring defendant gave Caramelo was L.'s. L. identified other items seized by arresting officers, including the gold watch that defendant left in Pierce's car.

Based on ballistics tests, a criminalist with the Los Angeles County Sherriff's Department determined that the expended casings found in Aguirre's apartment were fired from the .357 Magnum handgun retrieved from Pierce in Oregon. The witness reached a similar conclusion as to the expended bullets found in the Finzels' bedroom.

**9.** *Medical Testimony*

Dr. Carlos Donayre testified that emergency surgery was required to save L.'s life after the shooting. One bullet entered the side of her body, penetrated several vital organs, and exited through the arm. Another bullet entered and exited the back, grazing the spine. Because L.'s weak state prevented the use of general anesthesia, she received only mild narcotics during the three-hour procedure. L. confirmed that she "wasn't numb" on the operating table, and that the pain of surgery seemed "worse than being shot."

Dr. Susan Selser, the medical examiner who performed the autopsy on Joseph, testified that he sustained two gunshot wounds, each of which entered the chest and exited through the back. One struck the lung and aorta, and the other pierced the heart. Both were fatal.

**B. Defense Case**

Defendant presented no evidence at the guilt phase.

10

## II. PENALTY EVIDENCE

### A. Prosecution Case

#### 1. *Prior Felony Conviction*

In 1989, before he committed the capital crime, defendant was convicted in Oregon as an adult of a felony, theft, also known as receiving stolen property.

#### 2. *Circumstances of the Capital Crime*

George Aguirre testified that one month before defendant and Pierce drove to Torrance on May 8, 1993, when the capital crime occurred, defendant visited Aguirre there alone. While smoking marijuana one night, defendant said, "I wonder what it would be like to rape a woman at gunpoint." He seemed serious at the time. Nothing more on the topic was said.

The only other prosecution witness at the penalty phase was L., who described the effects of the capital crime, as follows: When the murder occurred, her daughter, Brinlee, was about two months old, and Joseph's son, Garrett, was seven years old. Joseph was 29 years old when he died. He was an only child. His death devastated his parents.[3]

L. and Joseph met in March 1990, fell deeply in love, and married in May 1992. They enjoyed outdoor activities together. To prepare for marriage, they attended an "engagement weekend" with other couples. At trial, L. read a letter that Joseph wrote during that event.

L. testified that she and Joseph enjoyed spending time with Garrett. Together, the couple sometimes walked Garrett to and from school. Garrett

---

[3] Consistent with a prior ruling of the trial court, L. held Brinlee in her lap on the witness stand while identifying her to the jury. Immediately thereafter, L. evidently handed Brinlee (who said "bye-bye") to the prosecutor, who was standing nearby. It appears the child was then promptly given to someone else located in the spectator section of the courtroom.

played a key role in their wedding ceremony. L. had many fond memories of that day. Wedding photos were introduced at trial.

According to L., she and Joseph planned to have more children and to move to the country where they could ride horses and motorcycles. Meanwhile, Joseph worked for a computer company, and L. was a homemaker. They ran a small business bringing pets and a pony to children's birthday parties. Photographs of these events were introduced.

L. described the support Joseph provided during her pregnancy, including his presence in the delivery room when Brinlee was born. The umbilical cord was wrapped around Brinlee's neck, requiring medical treatment. Joseph surprised L. afterwards with 100 red roses. One month later, the family, including Brinlee, went camping together. Photos of family trips and outings were introduced.

L. recalled the terror she felt during the capital crime. While hospitalized afterwards, she had tubes in her throat and could communicate only by writing notes, She read the notes in court.

After the murder, L. and Garrett became estranged. L. has no permanent home and lives with different relatives. Medication and therapy have not eased her fear, guilt, and grief.

L. testified that she visits Joseph's grave twice a week. The cemetery is near other special places, such as the hotel where the couple spent their wedding night. She described markings on the headstone, as well as the various mementos that were buried with Joseph or placed on his grave later.

Following L.'s testimony, the jury watched an 11-minute 45-second videotape. The videotape shows L. from the shoulders up, talking in front of a plain gray backdrop. Her voice also is heard describing video clips and still photographs that appear on the screen. Both the narration and images concern the joy L. and Joseph shared as a couple (e.g., getting married, raising children,

12

relaxing at home, and enjoying the outdoors), and the loss she experienced from his death (e.g., emotional turmoil, estrangement from Garrett, and a gravesite visit with Brinlee on Christmas Day).

The videotape departs from the foregoing format in only two respects. First, at the beginning, white lettering silently appears on a black screen, referring to an "intruder" who entered L. and Joseph's home on Mother's Day 1993, and who forever "altered" their lives and the lives of family and friends. Second, at the end of the videotape, a song plays softly in the background for 80 seconds, with lyrics about a "hero [who] goes free" and a "villain [who] goes to jail." More images of the Finzels appear at that time, including one of Joseph as a boy sleeping with a puppy.

### B. Defense Case

Various relatives, friends, juvenile justice officials, and mental health professionals testified on defendant's behalf. He did not take the stand.

### 1. *Family History*

Defendant's mother, Suszanne, married Adolpho "Rudy" Garcia when she was 18 years old. Defendant was one of three boys born in fairly quick succession during the marriage. However, defendant and his older brother, Fred Garcia, are not related by blood to Rudy, and were each fathered by different men. Only the youngest boy, Teodi Garcia, is Rudy's biological son. Defendant, who was born in 1970, did not learn this fact until age 13.

By the time defendant started kindergarten, Suszanne and Rudy were divorced. Though Rudy had legal custody of the three children, Suszanne decided to keep them with her. She and the boys moved several times over the next few years, living in Idaho, Texas, Alabama, and Washington. Suszanne had a series of

13

romantic partners during this time, including her second husband, Frank Poleta. Defendant's younger brother, Teodi, testified that Suszanne was a loving mother.

After defendant finished the third grade, Suszanne left the children in Georgia at the home of her first husband, Rudy, who "they thought was their father." They lived with Rudy and his new wife, Cecelia, for two years. Teodi and Fred testified that Cecelia punished all three boys harshly. She made defendant, who wet the bed at night, stand outside wearing his soiled underpants on his head, holding a sign stating that he was a bed wetter. Once, when defendant accidentally hit Cecelia's hand with the car door, she slammed the door on his hand.[4]

As a fifth or sixth grader, defendant left Rudy's home in Georgia and reunited with his mother, Suszanne. She lived in Oregon and had a new partner, Randy Newton. Suszanne testified that defendant developed learning problems and became disruptive in class. The drug Ritalin eased his hyperkinetic symptoms and improved his school performance.

Before defendant entered the seventh grade, Suszanne met Tim Tugg, who became her third husband. Tim had no interest in raising defendant, Fred, or Teodi, and doted on his own children, including a son, Matthew, whom he had with Suszanne. Suszanne testified that Tim was "physically and emotionally abusive to me and my kids." Tim and Suzanne used marijuana and cocaine at home, and gave drugs to the children. Tim drank alcohol every day. Tim told

---

**4** On cross-examination, Fred Garcia noted that Rudy and Cecelia were both Filipino, but that Rudy was raised in the United States and Cecelia was not. Fred opined that "upbringing or culture" may have explained their disparate parenting styles, with Cecelia being "the one with the backbone."

14

defendant that Rudy Garcia was not his biological father. That night, defendant stole property and was arrested.

Defendant's biological father, Patrick Grandchampt, testified that he became acquainted with defendant during the capital case. Grandchampt read two letters from defendant seeking to develop a father-son relationship. The witness testified that he cared about defendant, and chose not to disclose his true identity earlier for fear of "destroy[ing] everything."

### 2. *Juvenile Delinquency*

Beginning in 1983, when he was 13 years old, defendant came under the authority of the juvenile justice system in Oregon. A probation officer, Larry Tomanka, testified that defendant's home life was dysfunctional, that family counseling was not likely to succeed, and that placement outside the home eventually occurred.[5] Steven Walker, a probation counselor, testified that defendant behaved well while confined in a juvenile facility in 1987. However, he was estranged from his family, and his bedwetting continued. Joan McCumby, a court counselor, found the family to be guarded and tense, especially around Tim Tugg. She believed the children had been mistreated while living with Rudy Garcia and Cecelia in Georgia. McCumby knew of no medical cause for defendant's bedwetting problem, and learned that he had been treated for

---

**5**     On cross examination, Tomanka disclosed certain criminal acts that defendant allegedly committed as a juvenile. Some of these allegations were dismissed following defendant's favorable performance on probation (e.g., burglary, unauthorized use of a motor vehicle, and possessing alcohol). Others led to adjudications of guilt (e.g., theft, assault, criminal trespass, and being a runaway). Penalty instructions prevented the jury from considering evidence of any crime in aggravation unless it either involved force or violence or resulted in a prior felony conviction. (See § 190.3, factors (b), (c).)

hyperactivity as a child. An updated evaluation disclosed that the latter condition had dissipated and that medication was unnecessary.

### 3. *Mental Condition*

Dr. Arthur Kowell, a neurologist, performed a brain electrical activity mapping (BEAM) study of defendant before trial. Defendant's performance in two areas, involving visual and auditory responses, showed abnormality in the frontal and temporal lobes. Both regions affect impulse control, among other things. These test results were consistent with attention deficit hyperactivity disorder (ADHD).

Dr. Nancy Kaser-Boyd, a psychologist, interviewed defendant and various family members, conducted psychological tests, and reviewed school, medical and probation records. In her opinion, defendant was a highly manic person, predisposed as an adult to committing criminal acts and suffering from mental illness and drug abuse. Dr. Kaser-Boyd determined that defendant suffered from ADHD as a child (evidenced, in part, by his bed-wetting), that the condition was likely inherited from his parents (including Patrick Grandchampt), and that he suffers from an adult version of the disorder (attention deficit disorder residual). Other risk factors for adult dysfunction included mental and physical abuse, as well as sexual molestation, as a child. On the latter point, Dr. Kaser-Boyd testified that she was told by Fred Baumgarte, defendant's grandfather, that Rudy Garcia had "touched" defendant's genitals "in a sexual way" when defendant was three or four years old. Rudy was married to Fred's daughter, Suszanne, at the time.[6]

_____

[6] Dr. Kaser-Boyd alluded to another sex act that Rudy Garcia allegedly committed against defendant as a child. Offering few details, she noted that the incident differed from the one reported by Fred Baumgarte, that it involved oral copulation, and that it was disclosed to her by defendant's uncle, Reginald Baumgarte. Reginald did not testify at trial.

16

### C. Prosecution Rebuttal

Fred Baumgarte confirmed that he saw a sexual fondling incident similar to the one that Dr. Kaser-Boyd described. However, as discussed further below, both Fred and his wife, Dorothy Baumgarte, testified that they did not remember discussing the matter with Dr. Kaser-Boyd. Amy York, a defense paralegal, prepared a report before trial indicating that defendant's older brother, Fred Garcia, told her that Tim Tugg physically abused only his wife Suszanne — not defendant and his brothers, Fred and Teodi.

## III. PRETRIAL ISSUES

### A. Grand Jury Selection Process

Defendant contends that the judicial nomination process long used in Los Angeles County to select prospective grand jurors — a process that led to the random draw of the grand juries that indicted defendant and, presumably, countless other persons — involved intentional and invidious discrimination, and resulted in the substantial underrepresentation of women and Hispanics in the grand jury pools. The claim is based upon the equal protection clause of the Fourteenth Amendment of the United States Constitution. Defendant seeks automatic reversal of the indicted counts, including capital murder. In our view, no constitutional violation or reversible error occurred.

#### 1. *Trial Court Proceedings*

On June 3, 1993, the Grand Jury of Los Angeles County returned an indictment, which was filed in superior court, charging defendant with the Finzel crimes.[7] In a separate superior court case, an information was filed on November

---

[7] The indictment contained seven counts and related allegations. The first six counts ultimately produced the guilty verdicts we have described: first degree murder of Joseph Finzel with special circumstances (count I), attempted premeditated murder of L. (count II), burglary of the Finzel residence (count III),

*(footnote continued on next page)*

30, 1993, charging defendant with burglary of the Kozak residence. Both cases were consolidated for trial on May 12, 1994.

On May 23, 1994, defendant moved in writing to dismiss the indictment. At the hearing on November 4, 1994, defendant argued that the grand jury selection process discriminated against women and Hispanics, and thus violated the equal protection guaranteed by the Fourteenth Amendment of the United States Constitution, as set forth in *Castaneda v. Partida* (1977) 430 U.S. 482 (*Castaneda*). Defendant claimed he had made a prima facie case, which the People did not rebut, by showing that both groups were substantially underrepresented in Los Angeles County Grand Jury pools over time, and that the nominating process was "highly subjective" and "susceptible of abuse as applied." (*Id*. at p. 497.) The prosecutor replied that to the extent the two cases conflict, *Castaneda* had been "superseded" by *Duren v. Missouri* (1979) 439 U.S. 357 (*Duren*), which prohibits "systematic" exclusion in violation of the Sixth Amendment right to an impartial jury drawn from a fair cross-section of the community. (*Id*. at p. 364.) The prosecutor insisted, however, that nothing in *Duren* affected *Castaneda*'s requirement that, for equal protection purposes, "the defense actually has the burden of proving intentional discrimination."

Extensive evidence was admitted at the hearing through (1) live witness testimony, (2) documentary exhibits, and (3) other voluminous materials that the

---

*(footnote continued from previous page)*

robbery of L. (count IV), attempted forcible rape of L. (count V), and forcible oral copulation of L. (count VI). Count VII of the indictment alleged an additional act of forcible oral copulation against L. The latter count was dismissed at the People's request at trial.

18

court judicially noticed from the record in an unrelated criminal case.[8]  First and foremost, two superior court employees, Gloria Gomez and Juanita Blankenship, testified about the Los Angeles grand jury selection process, as follows:[9]

Unlike trial jurors, who are randomly summoned from Department of Motor Vehicle lists and voter registration rolls, grand jurors perform a voluntary public service and are not, in Blankenship's word, "draftees" of the court.  A full-time commitment is involved.  Grand jurors serve for one year.[10]  They meet four or five days a week.  The pay is $25 a day, plus mileage costs.

Blankenship alluded to certain statutory eligibility requirements for grand jury service.  Some, she noted, also apply to trial jurors (e.g., being a citizen age 18 or older, knowing the English language, and having no felony convictions).  However, only grand jurors have a one-year county residence requirement, and cannot hold elective office.

According to both witnesses, all grand jurors are first nominated by a superior court judge.  At the time of Blankenship's testimony, there were 238 judges on the Los Angeles County Superior Court.  Each judge is allowed to

---

[8]  The judicially noticed items are included in the instant record on appeal. They consist of 19 volumes, or nearly 5,000 pages, of transcribed testimony and documentary exhibits from *People v. Vallarino*, *et al*., Super. Ct. L.A. County, 1992, No. BA027100.  Such items (which include no trial court findings) were generated over a 14-month period from February 1992 through April 1993.

[9]  Gomez personally testified in this case that she worked as the manager of juror services for the Los Angeles County Superior Court, and was familiar with the manner in which both grand and trial jurors were selected.  She had held that post for about two and one-half years before the hearing.  Gomez's predecessor, Blankenship, ran the court's juror management division from 1988 through 1992. Blankenship's testimony was admitted in transcribed and judicially noticed form.

[10]  The one-year period in Los Angeles County runs from July 1 through June 30.  Defendant was indicted on June 3, 1993, during the 1992-1993 grand jury term.

nominate up to two persons a year. However, nothing prevents any judge from nominating only one person or making no nomination at all.

Blankenship made clear that there are two ways to be nominated: (1) "be known to the judge or make yourself known to the judge and ask to be nominated" (direct nominees), or (2) "volunteer to be a candidate for a nomination" (volunteer candidates). Either way, the person completes the same standard application, which the nominating judge eventually signs. It gives applicants the option of disclosing race or ethnicity, and seeks a brief biographical statement. The jury commissioner hands or mails an application to every person who requests one. It can be returned by mail or in person.

For volunteer candidates (as opposed to direct nominees), submission of an application triggers a formal interview process. The person meets, at random, with one of the judges serving on the court's grand and trial juror committee (Committee). The interview concerns statutory requirements and qualifications for grand jury service, as set forth in written guidelines promulgated by the Committee.[11] Blankenship testified that the guidelines, in addressing technical

---

[11] Defendant introduced two sets of Committee guidelines in the present case. The first document, called "Guidelines [for the] Selection of Grand Jury Nominees," lists the statutory eligibility requirements for grand jury service, including a criminal background check. These guidelines also describe the time and service commitments required of grand jurors, such as the restriction on personal involvement in political campaigns during their term, the need for a written release from any employer if job demands would conflict with grand jury duties, the inability of grand jurors to take extended vacations or to miss any meetings in July, and the modest fee and mileage costs paid for such attendance. The last item in this document describes groups whose nomination would appear to raise a conflict of interest (e.g., relatives of any nominating or sitting judge, county employees, and active peace officers).

The second document, "Guidelines for Interviewing Prospective Grand Jurors," advises that candidates be told about the time, service, and pay standards

*(footnote continued on next page)*

and clerical skills, do not seek to exclude applicants who lack office jobs or college degrees. Gomez noted that administrative skills bear on the grand jury's "civil function." After the interview, the interviewing Committee judge assigns a rating, and notes it on the form, as the guidelines provide.

Copies of all applications submitted by volunteer candidates are distributed for nomination purposes to every judge on the superior court. As with direct nominees, a volunteer candidate is nominated when any one judge signs the form.

A tentative list of grand jury nominees is published in the newspaper, and circulated to the entire superior court to lodge any objection. In Blankenship's experience, such objections are rare, and typically involve conflicts of interest, such as when a nominee is related to a sitting judge. (See *ante*, fn. 11.) Once this process is complete, a final list of nominees is compiled, filed, and published. According to Blankenship, the grand jury pool typically consists of 150 to 175 nominees. Many are volunteer candidates.[12]

The next step is a random blind draw from a jury wheel of the names of 40 prospective grand jurors and 10 alternates. The sheriff's department conducts criminal record checks of these 50 individuals. The names of those nominees who

_____

*(footnote continued from previous page)*

for grand jurors, and about the criminal background check. It further suggests questions on the candidate's knowledge of the grand jury function, past experience and level of responsibility in community affairs, special interest in or qualification for grand jury service, and specific skills (e.g., accounting, communications, report writing, and interviewing). The interviewer is asked to rate the candidate, and to note the rating on the application (i.e., "exceptionally well qualified," "well qualified," "qualified," and "uncertain").

[12] For instance, every volunteer candidate who applied for the 1990-1991 term (excluding those who later withdrew or missed the interview) was nominated as a grand juror. That year, such volunteers comprised 40 percent of the pool.

survive this check are again placed in the jury wheel. Another random blind draw then occurs to select the actual grand jury. Gomez testified that there are 23 grand jurors and four alternate jurors in Los Angeles County.

Both Blankenship and Gomez described the superior court's ongoing campaign to recruit grand jurors from a broad cross-section of Los Angeles County residents. In Blankenship's words, "substantial affirmative efforts" are made to attract Hispanics and members of other minority groups. Every year, a press release circulates to over 100 newspapers and media organizations, including most Spanish-language outlets. Public service announcements run in both English and Spanish on television and radio stations. Recruitment letters are sent to community groups, public officials, and consulates countywide. Judges personally consult with Hispanic community groups on the issue.[13]

In a related vein, the record includes a sample "Nomination Form." Consistent with Blankenship's testimony, the form asks grand jury applicants to disclose their race or ethnicity (e.g., "Caucasian," "Black," "Hispanic," "Asian," or "Other Minority"), and states that such information is "optional" and "voluntary." The following explanation appears nearby: "Recent Supreme Court decisions place added emphasis on the ethnic makeup of the pool from which Grand Jurors are drawn. Your answer will assist the Judges of the Court in

---

[13] Regarding these outreach efforts, the trial court admitted into evidence, among other things, a photocopy of a newspaper announcement titled *County Seeks Grand Jurors*, dated Monday, November 27, 1989. The item invites qualified persons to apply for the upcoming grand jury term, lists the basic conditions of service, and describes how to obtain an application. In addition, the then-Presiding Judge of the Los Angeles County Superior Court is quoted as seeking a grand jury pool that " 'reflect[s] the diverse makeup' " of the county, and urging interested " '[B]lack, Hispanic or Asian' " citizens to volunteer.

22

establishing full compliance with these decisions." On an adjacent line, applicants are asked to specify whether they were "Male" or "Female."

In addition to information about the nominating process, defendant introduced statistical evidence. Regarding women in the grand jury pool, one chart indicated that, based on the 1990 Census, women comprised 50 percent of the population of Los Angeles County 18 years and older. Another chart showed the gender of grand jury nominees from the 1986-1987 term through the 1993-1994 term. The percentage of women in the pool ranged from a low of 34 percent one year, to a high of 50 percent another year. However, for five of the other eight years, grand jury nominees were 40 to 45 percent female. At the hearing, defense counsel used an "absolute disparity" measure, which calculated the difference between the percentage of adult women in the population and the percentage of women in the grand jury pools. Such disparity ranged from zero to 16 percent at each extreme, and otherwise hovered mostly in the 5 to 10 percent range.

Finally, demographic testimony by three experts was admitted, in transcribed and judicially noticed form, concerning Hispanics in the grand jury pool. Relying on the 1990 Census and other sources, the witnesses used different assumptions, methodologies, and measures, and their calculations produced varying results. Notably, Dr. Nancy Bolton found an absolute disparity of 9.7 percent between the percentage of adult Hispanic citizens in Los Angeles County and the average percentage of Hispanics in the county's grand jury pools over a five-year period between 1986 and 1991. Dr. Bolton also found that 73 percent of the Hispanic volunteer candidates who were interviewed by superior court judges were nominated, compared to only 46 percent of their White counterparts. She inferred that the judges were "enriching" the Hispanic pool of nominees.

By comparison, certain absolute disparity figures gleaned from the testimony of Dr. William Clark — 10.5 percent — and Dr. Dennis Willigan —

23

11.4 percent — were similar to, but somewhat higher than, Dr. Bolton's figure. Dr. Clark and Dr. Willigan based these results on the percentage of the Los Angeles County population who were Hispanic voting age citizens and who spoke English "well" (as opposed to those who spoke only "some" English or who spoke English "very well").  Both of these witnesses also used the six-year period from 1986 through 1992 to calculate the average percentage of Hispanics in Los Angeles County Grand Jury pools.  Dr. Willigan opined that the various disparities might be attributable to judges not knowing, and therefore not nominating, persons from "certain racial or ethnic groups."  He admitted, however, that "whatever goes on in the nomination process," or "how or why it does, I don't know."

After considering the foregoing evidence, the trial court rejected the grand jury challenge on the ground defendant had not presented a prima facie case of unconstitutional discrimination.  In describing the principles and authorities used to make this decision, the court explicitly "agreed with the People's position."  Based on the above described arguments of the parties, the court apparently believed that *Duren, supra*, 439 U.S. 357, "superseded" *Castaneda, supra*, 430 U.S. 482, to some extent, but that the defense retained the burden of proving "intentional" discrimination under the latter case.  In any event, after acknowledging that women and Hispanics were distinctive groups entitled to constitutional protection, the court declined to decide whether there was a meaningful difference between the percentage of women and Hispanics nominated as grand jurors, and the percentage of women and Hispanics in the population eligible for such service.  Instead, under the "third prong" of the test being applied, the court found no evidence of "any discriminatory system in place by the superior court."  Hence, the motion to dismiss the indictment was denied.

24

### 2. *Analysis of Constitutional Claim*

On appeal, defendant renews his argument that the judges of the Los Angeles County Superior Court violated equal protection guarantees by purposefully discriminating against women and Hispanics in selecting nominees for the pool from which his grand jury was drawn. We first summarize the statutory scheme which regulates this process, and which gave rise to the challenged procedures. The grand jury scheme, which codified prior law, has been in effect for decades. (See § 888, et seq., added by Stats. 1959, ch. 501, § 2, p. 2443; see also *id.*, § 20, p. 2458; *People v. Superior Court* (*1973 Grand Jury*) (1975) 13 Cal.3d 430, 436 & fn. 5 (*1973 Grand Jury*).)

Each county must have at least one grand jury drawn and impaneled every year. (§ 905; see Cal. Const., art. I, § 23.) The grand jury consists of "the required number of persons returned from the citizens of the county before a court of competent jurisdiction," and sworn to inquire into both "public offenses" within the county and "county matters of civil concern." (§ 888; see § 888.2 [specifying "required number" of grand jurors based on county size]; see also §§ 904.4-904.8 [authorizing "additional" grand juries depending on county size].) This general authority over both criminal and civil matters involves three functions: (1) weighing criminal charges and deciding whether to present indictments (§ 917), (2) evaluating misconduct claims against public officials and deciding whether to formally seek their removal from office (§ 922), and (3) acting as the public's "watchdog" by investigating and reporting upon local government affairs. (§§ 919-921, 925 et. seq.; see *McClatchy Newspapers v. Superior Court* (1988) 44 Cal.3d 1162, 1170 (*McClatchy*).) In counties with a single grand jury, that one body performs all three functions. (See 76 Ops.Cal.Atty.Gen. 181, 182 (1993)

25

[concluding that any additional grand jury authorized by statute is restricted to criminal matters and may not perform civil oversight functions].)**14**

In California, unlike other jurisdictions, the grand jury most often plays the civil oversight role. (*McClatchy, supra*, 44 Cal.3d 1162, 1170; see *1973 Grand Jury, supra*, 13 Cal.3d 430, 436, fn. 4 [distinguishing federal grand juries insofar as they do not report on public affairs].) Many statutes identify specific topics of inquiry.**15** In performing its functions, the grand jury operates in secret. (E.g., §§ 915, 924.2, 939; see § 911 [oath].) It may retain auditors, appraisers and other experts (§ 926), and has subpoena power (§ 939.2; see § 921 [access to public records]). At the end of its term, the grand jury must issue a final report to the presiding judge of the superior court (§933, subd. (a)), documenting all findings therein. (§ 916; see *1973 Grand Jury, supra*, 13 Cal.3d 430, 434 [interim report].)

As shown by the testimony here, grand jurors must be citizens age 18 or older and have resided in the county for at least one year immediately before their service begins. (§ 893, subd. (a)(1).) A person who serves on this body also must have sufficient knowledge of the English language to perform the grand jury function (*id*., subd. (a)(3)), and be "in possession of his natural faculties, of ordinary intelligence, of sound judgment, and of fair character" (*id*., subd.

---

**14** Gomez, who managed jury services for the superior court when the instant hearing occurred, testified that Los Angeles County did not, at that time, maintain a "second," or additional, grand jury under statutes providing that option.

**15** For instance, the grand jury investigates and reports on operations, accounts, and records of county departments and districts (§ 925), housing (§ 914.1), unindicted prisoners (§ 919, subd. (a)), prison conditions (§ 919, subd. (b)), land transfers (§ 920), cities and joint powers agencies (§ 925a), salaries of county officials (§ 927), and the administrative needs of county offices (§ 928).

(a)(2)).[16] The county pays grand jurors a modest daily fee, and reimburses mileage costs, upon the order of the superior court. (§§ 890, 890.1.)

The Legislature has vested the superior court with responsibility for selecting grand jury members. (See *1973 Grand Jury, supra*, 13 Cal.3d 430, 438 & fn. 8 [noting close statutory relationship between grand jury and convening court].) Shortly before the county fiscal year begins, the court makes an order estimating the number of grand jurors required for that year. (§ 895.) Thereafter, "the court shall select the grand jurors required by personal interview for the purpose of ascertaining whether they possess the qualifications prescribed by subdivision (a) of Section 893." (§ 896, subd. (a).) If, "in the opinion of the court," these qualifications are met, the person selected must sign a statement declaring that he "will be available" for the "number of hours" required of grand jurors in the county. (*Ibid.*) The court makes a "list" of the prospective grand jurors it has selected, and gives it to the jury commissioner. (§ 896, subd. (b).)

After receiving and filing the list of prospective grand jurors, the jury commissioner publishes it in a newspaper of general circulation, along with the name of the judge who selected each person on the list. (§ 900.) The jury commissioner then randomly draws the names from the " 'grand jury box,' " using one of two methods. (*Id.*, subds. (a) [folded slips of paper], (b) [numbered markers].) Once drawn, the grand jury is "certified and summoned" (§ 906), and

---

**16** Conversely, someone is not eligible to act as a grand juror if he or she is serving as a trial juror, has been discharged as a grand juror within the preceding year, has been convicted of a felony or other specified offense, or is serving as an elected public official. (§ 893, subd. (b).) Certain exemptions and excuses also apply to grand jury service similar to those regulating trial jurors. (§ 894; see, e.g., Code Civ. Proc., § 219 [restrictions on peace officers as jurors].)

the grand jury is impaneled. (§ 905; see § 909 [before "accepting" anyone drawn as grand juror, court must be satisfied that they are "duly qualified"].)[17]

Against this statutory backdrop, and based on the evidentiary record, defendant contends the trial court erred in concluding that he failed to present a prima facie case that the grand jury nomination process violated federal equal protection guaranties. He insists all essential elements were present under *Castaneda*, *supra*, 430 U.S. 482, to wit, substantial underrepresentation of a distinct class (women and Hispanics) in the grand jury pool over time, and a highly subjective nominating process that was susceptible of abuse. Defendant argues that whether or not any "overt racism" was shown, the evidence he presented below raised an inference of purposeful and intentional discrimination, which the People did not rebut. We now consider *Castaneda* in some detail.

In *Castaneda*, defendant Partida was indicted and convicted of a felony in Hidalgo County, Texas, near the Mexican border. In seeking a new trial in state court, he claimed his federal equal protection rights had been denied because of the historical underrepresentation of Mexican-Americans on grand juries in the county when he was indicted in 1972. Besides testifying about racial

---

**17**    An "alternate" grand jury nomination procedure exists. (4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Criminal Procedure, § 32, p. 48.) In this system, the jury commissioner, applying written standards adopted by a majority of the superior court, furnishes the judges annually with "a list of persons qualified to serve as grand jurors." (§ 903.1.) From this list, a majority of judges may select persons who, "in their opinion," should serve as grand jurors, provided they are "suitable and competent," as required by law. (§ 903.3) However, the judges "are not required to select any names from the list returned by the jury commissioner." (§ 903.4.) Rather, they may, "if in their judgment the due administration of justice requires, make all or any selections from among the body of persons in the county suitable and competent to serve as grand jurors." (*Ibid.*)

discrimination in the area, Partida introduced evidence from the 1970 Census showing that 79.1 percent of the county's population was Mexican-American, and that the group was underprivileged by various socioeconomic measures. Partida also showed that the average representation of Mexican-Americans on grand jury lists over an 11-year period, from 1962 to 1972, was 39 percent. In rebuttal, the state offered no evidence to show that the alleged underrepresentation and discrimination had not occurred. Ultimately, the motion for a new trial was denied, and the conviction was affirmed on appeal. (*Castaneda, supra*, 430 U.S. 482, 485-489.)

Partida renewed his equal protection claim on habeas corpus in federal district court. This time, the state outlined some of the procedures used to select grand juries in Hidalgo County, as follows: A state district court judge appointed from three to five jury commissioners. The commissioners, in turn, selected 15 to 20 persons to comprise the list from which the actual grand jury was drawn. When 12 persons on the list appeared by summons in court, the state district judge determined whether they were statutorily qualified to serve, examining them under oath on issues such as citizenship, voting age, literacy, mental soundness and moral character, and criminal record. As soon as the court found 12 qualified persons, they were impaneled as the grand jury. (*Castaneda, supra*, 430 U.S. 482, 484-485.) Also, the state district judge who applied these rules — called a "key man" system — testified that in appointing the commissioners (including a greater number of Mexican-Americans than persons from other ethnic groups), he advised them on the qualifications and exemptions related to grand jury service. However, there was no evidence in any form, including from the commissioners themselves, on the manner in which they compiled the grand jury list. (*Id*. at pp. 490-491.)

The federal district court declined to grant habeas corpus relief on grounds the prima facie case of discrimination was weak, and sufficient rebuttal had

29

occurred. The court surmised that the statistical evidence overstated the racial imbalance on the grand jury lists, and that it ignored the role of Mexican-Americans as a local "governing majority" who held prominent posts in the community. (*Castaneda, supra*, 430 U.S. 482, 491-492.) The latter theory referred to the fact that, at the relevant time, a large percentage of Mexican-Americans served, among other things, as jury commissioners, prospective grand jurors, actual grand jurors, and trial jurors in Partida's case.

However, the federal circuit court of appeals rejected this analysis and reversed the district court's decision. The court of appeals placed little weight on the "governing majority" approach, and otherwise found that Partida's prima facie showing of a constitutional violation had not been adequately rebutted by the State. (*Castaneda, supra*, 430 U.S. 482, 491-492.)

The United States Supreme Court granted a petition for certiorari by the State of Texas, through the Sheriff of Hidalgo County, challenging the equal protection theory on which Partida had prevailed in the federal court of appeals. In a five-to-four decision, accompanied by three dissenting opinions, the Supreme Court upheld the lower court ruling invalidating the state's grand jury selection process. (*Castaneda, supra*, 430 U.S. 482, 492, 501; see *id*. at p. 504 (dis. opn. of Burger, C. J.); see also *id*. at p. 507 (dis. opns. of Stewart, J. and Powell, J.).)

At the outset, *Castaneda* embraced the venerable notion that equal protection precludes a defendant from being tried under an indictment issued by a grand jury from which persons " 'of his race or color' " have been excluded " 'because of that race or color.' " (*Castaneda, supra*, 430 U.S. 482, 492.) Reviewing its prior decisions, the court observed that such conduct "is not unconstitutional solely because it has a racially disproportionate impact." (*Id*. at p. 493, italics omitted.) Rather, the equal protection clause of the Fourteenth Amendment targets discrimination that is "purposeful" and " 'intentional' "

30

(*Castaneda, supra*, 430 U.S. at p. 493), and that selects grand jurors in a " 'racially non-neutral' " way. (*Id*. at p. 494.)

In evaluating how the key-man system was applied in Hidalgo County, *Castaneda* set forth the requirements that a criminal defendant must meet in order to establish a prima facie equal protection violation. "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. [Citation.] Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. . . . Finally, [the court noted], a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." (*Castaneda, supra*, 430 U.S. 482, 494.) Once the requisite showing has been made, and a prima facie case of discriminatory purpose appears, "the burden then shifts to the State to rebut that case." (*Id*. at p. 495.)

Under this test, *Castaneda* held, Partida had presented a prima facie case. First, Mexican-Americans were "a clearly identifiable class." (*Castaneda, supra*, 430 U.S. 482, 495.) This conclusion rested on the common use of Spanish surnames in the group, and on the socioeconomic disadvantages its members had long endured.

Second, *Castaneda* found the statistical showing clearly sufficient for prima facie case standards. Partida had established a 40 percent disparity between the percentage of Mexican-Americans in the county's population and the average percentage of Mexican-Americans summoned as prospective grand jurors over an 11-year period before he was indicted. (*Castaneda, supra*, 430 U.S. 482, 495-496.) The court further indicated that the constitutional significance of the disparity would not change to the extent the relevant population could be limited,

31

based on the available statistical evidence, to persons who were statutorily eligible to serve as grand jurors. (*Id*. at pp. 486, fn. 6 [noting that exclusion of noncitizens resulted in only a "negligible" 3 percent decrease in the number of Mexican-Americans in the county population], 488, fn. 8 [finding a 26 percent disparity between Mexican-Americans 25 years or older who have "some schooling," and are presumably literate, and Mexican-Americans in grand jury pools].)

Third, the substantial underrepresentation of Mexican-Americans in grand jury pools did not end the inquiry. *Castaneda* proceeded to address the final factor it had identified as bearing on the establishment of a prima facie case — the nature of the grand jury selection process itself. The court noted that, as a general proposition, the key-man system was not inherently unconstitutional, and that it had repeatedly been upheld against facial challenge. However, referring to the Texas system in particular, the court characterized it as both "highly subjective" and "susceptible of abuse as applied." (*Castaneda, supra*, 430 U.S. 482, 497.) In context, such criticisms seemed directed at evidence the court had previously described indicating that no known methods or standards regulated the manner in which the commissioners compiled the grand jury lists. (*Id*. at pp. 490-491.) In any event, without further discussion, the court found that an inference of intentional discrimination arose, which the state was required to dispel. (*Id*. at pp. 497-498.)

In the final analysis, *Castaneda* determined that the state did not rebut the showing of intentional discrimination that Partida had made. The court emphasized the "barren" state of the record as to both the "motivations and methods of the grand jury commissioners." (*Castaneda, supra*, 430 U.S. 482, 499.) In light of the gross underrepresentation of Hispanics on the grand jury lists, the court indicated that proper rebuttal required some explanation as to how the commissioners determined "the other qualifications for grand jurors prior to the

32

statutory time for testing qualifications" in state district court. (*Id.* at p. 498.) Nor did the governing majority theory devised by the federal district court fill the evidentiary gap. The high court was not willing to assume that members of one definable group would never discriminate against other persons in the same group. It likewise did not matter to the court that certain local officials or prominent persons in Hidalgo County were Mexican-American. (*Id*. at p. 499.) For all these reasons, *Castaneda* concluded that there had been a denial of equal protection in the selection of the grand jury in Partida's case.

The United States Supreme Court has referred to *Castaneda, supra*, 430 U.S. 482, sparingly in the 35 years since it was decided, and has had no occasion to apply its equal protection analysis to a "key man" system under circumstances other than those at issue there. Nevertheless, the high court has reaffirmed, in closely related contexts, that *Castaneda* involved the Fourteenth Amendment's prohibition against *purposeful* and *invidious* discrimination. Thus, in *Vasquez v. Hillery* (1986) 474 U.S. 254, 260-264, the court declined to adopt a harmless error standard where the grand jury had been selected in violation of equal protection guaranties. Consistent with a long line of cases, the court observed that such a fundamental structural flaw in the proceedings compelled reversal of the conviction. Few constitutional errors were as grave, the court said, as the state engaging in the "intentional" exclusion of grand jurors because of their race. (*Id*. at p. 262; see *Rose v. Mitchell* (1979) 443 U.S. 545, 551-559 [similar analysis].)[18]

---

[18]    As noted, *Castaneda* echoed older cases that required a defendant asserting an equal protection claim to show that the challenged procedure resulted in the substantial underrepresentation in the grand jury pool "of his race or of the identifiable group to which he belongs." (*Castaneda, supra*, 430 U.S. 482, 494.) However, under *Campbell v. Louisiana* (1998) 523 U.S. 392, this limitation no longer seems to apply. In *Campbell*, a White defendant found guilty of second

*(footnote continued on next page)*

33

Against this backdrop, we are not entirely certain of the elements of a prima facie equal protection violation sufficient to shift the burden of proof from the defense, and to require rebuttal from the state. On the one hand, *Castaneda, supra*, 430 U.S. 482, speaks broadly of the "presumption," or inference, of discriminatory intent raised by the constitutionally significant underrepresentation of a distinct group over time (*id*. at p. 494), of the underlying "support[ ]" for such inference provided by a selection process that is "susceptible of abuse" or "not racially neutral" (*ibid*.), and of the "highly subjective" and malleable nature of the Texas key-man system in particular (*id*. at p. 497). Read in its most literal and absolute manner, such language arguably implies that mere statistical disparity, coupled with some official discretion in the selection of grand jurors, is always sufficient, without more, to raise a prime facie case of intentional discrimination.

On the other hand, it is difficult to conceive of a grand jury selection system — including one less unfettered and more objective than *Castaneda*'s — in

*(footnote continued from previous page)*

degree murder challenged his conviction on the ground that the grand jury foreman, and the grand jury venire from which he came, were the product of intentional discrimination in violation of equal protection guaranties and *Castaneda, supra*, 430 U.S. 482. The defendant argued, and the state did not dispute, that no Black person had served as a grand jury foreperson over a long period even though a substantial minority of registered voters in the community were Black. Reversing the state court, the high court held that the defendant had standing to raise an equal protection challenge to discrimination against persons of another race in the selection of his grand jury. The court said that "whether [or not] a white defendant's own equal protection rights are violated when the composition of his grand jury is tainted by discrimination against black persons," he could invoke "the well-established equal protection rights of black persons not to be excluded from grand jury service on the basis of their race." (*Campbell, supra*, 523 U.S. at p. 398.)

which *no* meaningful discretion guides the nominating process, and which would survive constitutional scrutiny under the foregoing view, assuming the requisite statistical showing was made. As reflected by the statutory requirement of personal interviews for grand jury nominees, and by the individualized screening process that the county used here, it seems inherent in the grand jury itself, and in its civic oversight role and strict schedule, that persons nominated and selected to that body not only be eligible and qualified to serve, but that they also be willing and able to do so. For this pragmatic reason, perhaps, *Castaneda* recognized that key-man systems are not unconstitutional per se, absent any evidence or inference of discriminatory intent "as applied." (*Castaneda, supra*, 430 U.S. 482, 497.)[19]

---

[19]    We also cannot ignore intervening developments that could complicate application of *Castaneda*'s prima facie test here. As noted by the trial court in this case, the high court held in *Duren, supra*, 439 U.S. 357, two years after *Castaneda, supra*, 430 U.S. 482, that the Sixth Amendment fair-cross-section rule prevented Missouri from allowing women to automatically exempt themselves from trial jury service. The test for establishing this prima facie Sixth Amendment violation, which arose and was not rebutted in *Duren*, was similar in all but one respect to *Castaneda*'s test for establishing a prima facie equal protection violation for grand juries. Specifically, as to the third prong, the automatic and disproportionate exclusion of women from trial juries was deemed a "systematic" flaw *inherent* in state law, requiring no showing of discriminatory intent. (*Duren, supra*, 439 U.S. at p. 364; see *id*. at pp. 366-367 & fn. 26, 368.)

In deciding whether the latter element exists under the Sixth Amendment and *Duren*, this court has declined to "infer[ ]" or "speculate[ ]" from a mere statistical showing of substantial underrepresentation in trial jury venires, plus identification of a feature of the selection process that *might* have produced the disparity, that a constitutional flaw affected the selection process or caused such disparity. (*People v. Bell* (1989) 49 Cal.3d 502, 528 (*Bell*); see *id*. at pp. 524, 529 [hardship excusals granted on gender- and race-neutral grounds].) Here, however, for reasons stated above, we need not face the apparent anomaly of indulging in such speculation in the equal protection context, and thereby making it easier to show, prima facie, *intentional* and invidious discrimination in nominating grand jurors than it is to show merely *systematic* exclusion under the Sixth Amendment. (See *People v. Burney* (2009) 47 Cal.4th 203, 222-227 [assuming that 6th Amend.

*(footnote continued on next page)*

35

We now determine whether defendant's motion to dismiss the indictment was properly denied. We begin by noting the parties' agreement that women (see *Duren, supra*, 439 U.S. 357, 364), and Hispanics (*Castaneda, supra*, 430 U.S. 482, 495), each qualify as a distinct class for equal protection purposes. Hence, the first prong of *Castaneda*'s "prima facie" test is met.

Regarding *Castaneda*'s second "prima facie" prong, as to which considerable evidence was admitted below, the significance of defendant's statistical showing is less clear. Here, as under the Sixth Amendment, the United States Supreme Court "has not yet spoken definitively on either the means by which disparity may be measured or the constitutional limit of permissible disparity." (*Bell, supra*, 49 Cal.3d 502, 527-528.) The exhibits showed various absolute disparities comparing adult women in the population to women in grand jury pools in Los Angeles over several years. While the difference spiked at one point, it otherwise was either zero or ranged between 5 and 10 percent. Likewise, there was no expert consensus concerning the absolute disparity between Hispanics in the county population and Hispanics in grand jury pools, with each witness defining and measuring such groups for statistical purposes differently. (See *id.* at p. 526, fn. 12 [defendants must use available "jury-eligible population"

---

*(footnote continued from previous page)*

fair-cross-section requirement applies in grand jury context]; *People v. Carrington* (2009) 47 Cal.4th 145, 177-178 [same].) It appears the high court has declined to engage in similar speculation under circumstances much like those in *Bell, supra*, 49 Cal.3d 502. (See *Berghuis v. Smith* (2010) __ U.S. __, __ [130 S.Ct. 1382, 1395] [finding no prima facie case under *Duren, supra*, 439 U.S. 357, where defendant merely assumed that a "laundry list of factors" *might* have been the " 'systematic' cause[ ]" for the underrepresentation of African-Americans in jury venires in the county's lone felony court, including hardship excusals and the alleged " 'siphoning' " of African-Americans to misdemeanor courts].)

36

figures in fair-cross-section cases].)  Some of the more relevant absolute disparity figures for Hispanics ranged from 9.7 percent to 11.4 percent.

At bottom, none of the disparities shown for either women or Hispanics in this case approaches the 40 percent mark in *Castaneda*, *supra*, 430 U.S. 482.  Nor do they show substantial underrepresentation over time outside the more modest limits that courts have assumed are constitutionally permissible.  (See *Bell, supra*, 49 Cal.3d 502, 528, fn. 15 [reviewing cases that deemed absolute disparity of 4.5 to 11.49 percent "insufficient," and that "seemingly" reached opposite result as to 14 percent disparity]; see also *People v. Burgener* (2003) 29 Cal.4th 833, 856-857 [declining to decide effect of 10.7 percent disparity on fair-cross-section claim].)

However, we need not resolve these statistical issues.  The same is true as to whether defendant has met *Castaneda*'s third "prima facie" prong by showing that the grand jury selection procedure was "not racially neutral" (*Castaneda, supra*, 430 U.S. 482, 494), or was "highly subjective" and "susceptible of abuse as applied" to women and Hispanics (*id*. at p. 497).  The reason is that even assuming a prima facie case exists under *Castaneda*, the evidence admitted and considered by the trial court is more than sufficient to "dispel [any] inference of intentional discrimination" and to show that no equal protection violation occurred  (*Id*. at pp. 497-498.)

To recap the process, grand jurors are randomly selected from a group of persons nominated by the judges of the Los Angeles County Superior Court.  The original pool of applicants for nomination includes both volunteers from the community and individuals personally known to the judges.  The superior court determines "by personal interview" whether prospective grand jurors meet the eligibility requirements under section 893, subdivision (a).  (§ 896, subd. (a).)  Section 893, subdivision (a) ensures that such persons have, among other things, the basic capacity to perform the grand juror function.  Elsewhere, the scheme

defines such function in terms of the responsibility to conduct criminal and civil inquiries, most of which concern investigating and reporting on the financial, administrative, and legal affairs of government agencies and officials. The relevant statutes further assume that this service, which is largely uncompensated, demands a high level of personal commitment from those sworn to perform it. Thus, in addition to determining eligibility and qualification to perform the grand jury function, the court must ensure that nominees can and will work the necessary hours. (§ 896, subd. (a).) These statutory requirements are neither uncommon nor inherently unconstitutional. (See *Carter v. Jury Commission* (1970) 396 U.S. 320, 331-337; 1 Wharton's Criminal Procedure (14th ed. 2010) § 4:4, pp. 4-30 to 4-42.)

The evidence in this case showed that the Los Angeles County Superior Court had adopted standard procedures and written guidelines to implement the foregoing rules. The jury commissioner gave the same application to all persons who wanted to serve as grand jurors, whether or not they were known to any judge. Similarly, the interview system used to nominate grand jurors was not limited to persons known to the judges, but was extended to everyone who volunteered to apply. To ensure that all applicants and interviewees were evaluated in a uniform and proper manner, the court used written guidelines focusing on statutory eligibility rules, relevant background and experience, and time and service requirements. Nominating responsibility was shared by the entire superior court bench, which consisted at the relevant time of 238 judges serving in courthouses located in different communities throughout Los Angeles County.

Contrary to defendant's view, nothing in these rules or procedures authorized, encouraged, or established that the judges nominated grand jurors in a manner that discriminated against women, Hispanics, or any other distinct group. Rather, the criteria used to select nominees were gender- and race-neutral, and clearly sought to test qualifications without reference to any impermissible

subjective factor.  Far from seeking to exclude members of minority groups from the pool of nominees, the superior court operated under a pro-diversity policy.  It engaged in a widespread campaign to recruit grand jury volunteers from all segments of the county population.  These efforts targeted Hispanics and other minority groups.  (See *People v. Burney, supra*, 47 Cal.4th 203, 227 [rejecting 6th Amend. fair-cross-section challenge to Orange County Grand Jury pool where superior court made "exhaustive efforts" to "invite Asian-Americans to apply"].)

In a related vein, the neutral selection criteria used by the Los Angeles Superior Court, consisting of statutory requirements and its own guidelines, were rationally related to the grand jury function.  The pool of persons who were eligible, qualified, and willing to serve as grand jurors was not unlimited.  Hence, in evaluating nominees, the court considered any traits, skills, and experience that would assist the grand jury in conducting its investigations and preparing its reports.  The testimony indicated that these standards were broadly inclusive and did not seek to eliminate persons based on occupation or education.  (See *People v. Brown* (1999) 75 Cal.App.4th 916, 927 [rejecting equal protection challenge to selection of grand jury foreperson where presiding judge in San Francisco Superior Court used "race-neutral," "job related" factors to make decision].)

Finally, in implementing the screening process, the Los Angeles Superior Court was evidently aware of its constitutional duties in selecting grand jurors, including the requirement that no one be excluded " 'because of [their] race or color.' " (*Castaneda, supra*, 430 U.S. 482, 492.)  Such awareness can be inferred from the written form given to all grand jury applicants, and distributed (at least in the case of volunteer candidates) to the entire court, announcing "full compliance" with the law in this regard.  Further, it appears that any racial or similar background information voluntarily provided on the form was used in a manner consistent with the diversity policy and outreach efforts we have described.

Indeed, the evidence showed that the application and interview process was not used to eliminate Hispanic volunteer candidates, because they were nominated at a higher rate than Whites who were screened in the same manner.

Thus, unlike *Castaneda*, on which defendant so heavily relies, the present record is filled with — not devoid of — evidence of the nondiscriminatory "motivations and methods" of the judicial officers who selected the grand jury pool.  (*Castaneda, supra*, 430 U.S. 482, 499.)  Accordingly, we conclude that the Los Angeles County procedure for the nomination of prospective grand jurors neither allowed, nor produced, purposeful or intentional discrimination against women and Hispanics.  We therefore reject defendant's claim that his indictment violated the Fourteenth Amendment, and that the motion to dismiss was erroneously denied.

## B.  Trial Jury Selection Process

Defendant maintains the trial court erred by excusing, for cause, a prospective juror who expressed "pro-life" views, and by rejecting his claims that the prosecutor's peremptory excusals of three female prospective jurors were improperly motivated by gender bias.  All such contentions lack merit.

### 1. *Overview*

We summarize the process used to select the trial jury in this case — context that defendant fails to provide in challenging such procedures on appeal. The process began with 160 prospective jurors.  After a preliminary screening, which resulted in numerous excusals on hardship grounds, a pool of 75 prospective jurors remained.  All 75 persons completed an 18-page questionnaire, which they were required to sign under penalty of perjury.  The written questions were the product of substantial collaboration between the court and counsel. About 25 percent of the questions concerned the death penalty.

Voir dire began with 18 prospective jurors inside the jury box, representing the 12 persons needed for the actual jury and the six persons needed as alternate jurors. The court examined each panelist at length. Counsel on both sides asked follow-up questions. Except for sensitive personal matters, voir dire occurred in open court.[20] At the bench, the parties exercised challenges for cause, followed by peremptory challenges.[21] When only 11 people were left in the jury box, the court called more names to create a new 18-person panel. This process occurred a total of seven times to select the 12-person jury. A similar procedure involving four panels of five persons each was used to choose the six alternate jurors.

## 2. *Challenge for Cause*

Defendant claims the trial court erred in granting the prosecution's challenge for cause to D.G., who was one of the first 18 persons to undergo voir dire. He argues here, much as he did below, that the ruling violated *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*), and thereby deprived him of due process, an

---

[20] At the time of trial, Code of Civil Procedure section 223 stated: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper . . . . Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." (Added by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990).) Effective January 1, 2001, the statute was amended to give counsel for each party an expanded, though not unlimited, right to examine prospective jurors through direct oral questioning. However, the provision regarding group voir dire remained unchanged. (Code Civ. Proc., § 223, as amended by Stats. 2000, ch. 192, § 1, p. 2216.)

[21] Here, as in other capital trials, defendant was "entitled to 20 and the people to 20 peremptory challenges." (Code Civ. Proc., § 231, subd. (a); see *id*., § 234 [allowing each side "as many peremptory challenges to the alternate jurors as there are alternate jurors called"].) As indicated below, neither party exhausted its allotment of peremptory challenges in choosing the actual and alternate jurors.

41

impartial jury, and a fair and reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments of the federal Constitution, and under parallel provisions of the state Constitution. We disagree.

The record discloses that D.G. expressed personal opposition to capital punishment on her questionnaire. She indicated that she "strongly agree[d]" with the statement that "[a]nyone who commits murder, attempted murder and sexual assaults should never get the death penalty." She explained her answer to this and other questions — including one soliciting her general views on the death penalty — by writing, "I do not believe in the Death Penalty." She also wrote that no one "should die at the hands of the Death Penalty," and that her preferred outcome in cases involving violent crimes was "jail for life." When asked to identify cases in which the death penalty was not appropriate, she wrote, "all cases." Consistent with this view, she listed no case, and left the answer blank, when asked to identify circumstances in which the death penalty was appropriate.[22]

On voir dire, the trial court first inquired whether D.G. held strong views on punishment. Echoing her questionnaire, D.G. said, "Right. I just don't believe in the death penalty." When the court noted that D.G. had circled "NO" in response to written questions about rejecting death or life imprisonment without parole in

---

[22] Less adamant were certain written responses showing how D.G. might apply her sentencing views in a capital case. For instance, she answered "no" when asked if she would "always" vote either for life imprisonment without parole or for the death penalty, regardless of the evidence, in a first degree murder case involving a felony-murder special circumstance. She indicated that she should consider all of the circumstances of the case before deciding between the two available penalties, and that she could not see herself rejecting the death penalty or, conversely, life imprisonment without parole "in the appropriate case." D.G. gave no answer when asked to identify significant or meaningful factors in deciding the appropriate penalty.

42

appropriate cases, she exclaimed, "Oh, I can vote for life." The court next asked whether there were "any circumstances you can imagine that you think death might be appropriate." D.G. replied— again, tracking her questionnaire — "no."

An exchange then occurred in which the trial court explored possible exceptions to D.G.'s apparent refusal to impose death in any case. When the trial court mentioned "Charlie Manson, serial killer," D.G. acknowledged hearing about the case on television, but twice said, "I don't know" in response to the court's question about the appropriate punishment. D.G. was also asked whether she could vote to impose the death penalty on Jeffrey Dahmer, another notorious serial killer who sexually assaulted and tortured his victims, among other things. D.G. indicated that she was familiar with the Dahmer case, but replied "No, I couldn't [impose death]. I am just one that don't [*sic*] believe in the death penalty." The court then posed its final inquiry along these lines, asking whether it was "possible" to reject life imprisonment without parole and vote for death if the aggravating evidence substantially outweighed the mitigating evidence. D.G. essentially answered in the negative, as follows: "It would be hard for me to, you know, vote that way. But again, I just don't believe in the death penalty. That is just my belief. I believe that we are put here on this earth to remain here unless otherwise, you know, from an illness or some other act we are taken away from here. I just can't see it. I just don't believe in it."

Defense counsel's follow-up examination consisted of a series of "yes" or "no" questions. At the outset, D.G. answered affirmatively when asked if she understood that defendant was entitled to jurors who held a diversity of views, that the law did not require any juror to vote for death in a given case, and that jurors must set aside their personal views and apply the law consistent with the court's instructions. Thereafter, D.G. continued to say "yes" when counsel asked whether she could follow the court's instructions to set aside her personal opinions and

43

render an impartial verdict under the law, and whether she could consider the death penalty and follow the law if instructed to do so in certain cases. However, midway through this exchange, D.G. interjected the following remark: "I would follow the law, although I still would — don't believe in the death penalty."

The prosecutor posed only a few questions. All of them confirmed D.G.'s personal feelings that she could not vote for the death penalty regardless of the circumstances of the case. At a sidebar conference, the prosecutor challenged D.G. for cause. Defense counsel objected on the ground D.G. gave appropriate answers to, i.e., "walked through," counsel's questions about following the law and instructions, and considering the death penalty. The trial court disagreed, saying "I don't think she walked through it. She was carried through it . . . . Even [so], she slipped out a little burst of independent thought there that she was not in favor of the death penalty. [¶] I think her feelings are clearly strong enough to interfere with following the court's instruction." The challenge for cause to D.G. was granted as a result.

Based on the foregoing developments, defendant contends that D.G. showed no disqualifying bias, and should not have been excused for cause, because her personal opposition to the death penalty would not have prevented her from imposing death "under any circumstances." Defendant relies heavily here, as below, on defense counsel's examination of D.G.

In *Witherspoon v. Illinois* (1968) 391 U.S. 510, the high court held that a death sentence cannot constitutionally be imposed by a tribunal "organized to return a verdict of death" (*id.* at p. 521), that is, by a jury that excluded veniremen for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Id.* at p. 522 & fn. 21 [suggesting it must be "unmistakably clear" the person would "*automatically*" reject death].) In *Witt, supra*, 469 U.S. 412, 424, the court

44

"clarif[ied]" *Witherspoon*, and held that a prospective juror may be excluded for cause because his views on capital punishment would either " 'prevent or substantially impair' " the performance of his duties under the instructions and the oath. Thus, under *Witt*, persons opposed to the death penalty may serve as jurors only if they "state clearly that they are willing to temporarily set aside their own beliefs and follow the law." (*People v. Avila* (2006) 38 Cal.4th 491, 529, citing *Lockhart v. McCree* (1986) 476 U.S. 162, 176.) In other words, such persons must "persuasively demonstrate an ability to put aside personal reservations, properly weigh and consider the aggravating and mitigating evidence, and make that very difficult determination concerning the appropriateness of a death sentence." (*People v. Stewart* (2004) 33 Cal.4th 425, 447.)

In a related vein, trial court findings regarding a prospective juror's views on capital punishment are entitled to substantial deference on appeal. (*People v. Avila, supra*, 38 Cal.4th 491, 529.) Hence, where answers given on voir dire are "equivocal or conflicting," the trial court's evaluation of the person's state of mind is generally binding on the reviewing court. (*People v. DePriest* (2007) 42 Cal.4th 1, 21, and cases cited.) The trial court is in the "unique position of assessing demeanor, tone, and credibility firsthand — factors of 'critical importance in assessing the attitude and qualifications of potential jurors.' " (*Ibid*., quoting *Uttecht v. Brown* (2007) 551 U.S. 1, 9.) As noted in *Witt* itself, the trial judge may be left with the "definite impression" that the person cannot faithfully and impartially apply the law even though he has not expressed his views with absolute clarity. (*Witt, supra*, 469 U.S. 412, 425-426.)

Applying this deferential standard here, we find ample evidence to support the trial court's determination that D.G.'s opposition to the death penalty would, at the very least, " 'substantially impair' " the performance of her duties as a juror. (*Witt, supra*, 469 U.S. 412, 424.) At every phase of voir dire, whether her answers

45

were given orally or in writing, and whether they were solicited by the court or counsel, D.G. repeatedly stated, in almost talismanic form, that she did "not believe in the death penalty." She also communicated with remarkable clarity in her questionnaire and during voir dire that the death penalty was inappropriate in *all* cases, and that she could conceive of *no* case in which she could or would reach a different result. The latter principle evidently held true no matter how vile the circumstances of the crime or how strong the evidence in aggravation.

Contrary to what defendant implies, D.G. never "state[d] clearly," in her own words, that she was willing or able to set aside these personal views and reject a sentence of life imprisonment without parole. (*People v. Avila, supra*, 38 Cal.4th 491, 529.) Nor does the record otherwise "persuasively demonstrate" an ability to follow the law and consider imposing a death sentence. (*People v. Stewart, supra,* 33 Cal.4th 425, 447.) Rather, after counsel led her through a series of "yes" or "no" questions on sentencing, and she seemed to accept the notion of following the law and instructions, D.G. lapsed into her repeated refrain, "I still . . . don't believe in the death penalty." Upon hearing D.G.'s voice and seeing her demeanor, the trial court found this view to be sincere, strong, and unyielding.

As in prior cases, where the prospective jurors' answers arguably seemed more equivocal and less absolute than those at issue here, we decline to second-guess the trial court's finding on appeal. (See, e.g., *People v. Solomon* (2010) 49 Cal.4th 792, 831 [upholding excusal for cause based on prospective juror's statements that though she " '[t]heoretically' " opposed the death penalty, she could " 'probably' " vote for death in some cases, but would find it " 'extremely difficult' " to do so]; *People v. Friend* (2009) 47 Cal.4th 1, 61 [same result where one prospective juror admitted being " 'slightly schizophrenic' " and unsure about voting for death, while another prospective juror apologized for " 'vacillating' "

on penalty and likewise did not know whether she could impose death].)
Accordingly, in our view, no error in excusing D.G. for cause occurred.

### 3. Wheeler/Batson *Claim*

Defendant insists the trial court erred in denying his motion for a mistrial after the prosecutor allegedly displayed gender bias by using her first three peremptory challenges against female prospective jurors. He argues here, as below, that such conduct violated the state constitutional right to a representative jury (*People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*)), and the federal constitutional guaranty of equal protection of the laws. (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); see *J. E. B. v. Alabama ex rel. T. B.* (1994) 511 U.S. 127, 129; *People v. Jurado* (2006) 38 Cal.4th 72, 104.)

As noted, after the 75 members of the jury pool completed their questionnaires, the court called 18 of them into the jury box. During the ensuing voir dire, the parties stipulated to excuse one woman, K.M., based on her past experience with violent crime and the court system. The prosecutor also dismissed another woman for cause, D.G., as discussed above. The parties then took turns exercising peremptory challenges against the 16 prospective jurors left on the panel. Critical here is the prosecution's use, at that time, of peremptory challenges against M.E., T.B., and N.F. — all three of whom were women. Defense counsel, in turn, struck one male and one female prospective juror. Seven more people were called into the box. The court and counsel questioned one of them, G.C., who answered mostly at the bench, outside the hearing of other jurors.

Immediately after G.C. returned to the jury box, and shortly before the court session ended for the day, defendant moved for a mistrial. Citing *Wheeler, supra*, 22 Cal.3d 258, defense counsel simply said, "The three peremptories that were exercised by [the prosecutor] were all women." However, as urged by the prosecutor, the trial court denied the motion because "no prima facie showing"

47

had been made. The court noted that while it usually "invite[d] the People to state their reasons for the record" in such cases, no action was "appropriate" on this occasion, apparently because the time to adjourn for the day had arrived. The court then dismissed the prospective jurors and ordered them back in the morning.

When voir dire resumed the next day, the court and counsel continued questioning the panelists who had been newly seated in the jury box near the end of the prior session, including G.C. During this process, the parties stipulated to the excusal of one female prospective juror, and a female replacement was called and questioned in the box. The court also acted on several challenges for cause. Once peremptory challenges against the remaining panelists began, defendant excused a woman. The prosecutor exercised the next peremptory challenge — her fourth overall — against M.D., who was a man.

Defense counsel responded by "renewing" his *Wheeler* motion from the previous day, and by also invoking *Batson, supra*, 476 U.S. 79. When the court noted the gender difference between M.D. and the three women who were the subject of the prior strikes, counsel replied that M.D., like one of those women, was Hispanic, i.e., belonged to a "cognizable group[ ]."

As before, the trial court found no *Wheeler*/*Batson* violation because there "clearly [was] no prima facie case." However, consistent with its prior comments about handling such motions, the court invited the prosecutor to "list [her] reasons" for the disputed strikes anyway. As discussed further below, the prosecutor complied with this request as to two of the women, M.E. and N.F., and as to the Hispanic male, M.D. However, regarding the third woman in the excused group, T.B., no reasons were given for her peremptory challenge. The prosecutor explained that she left her notes from the previous day "upstairs," and that she could not independently recall why she had excused T.B. The court denied defendant's motion for "lack of a prima facie case."

48

Defendant renews his *Wheeler/Batson* claim on appeal. He maintains that by using "all of her early peremptory challenges against women," the prosecutor created a "statistical" scenario amounting to a prima facie *Wheeler*/*Batson* case. Because the trial court reached a contrary conclusion, and found no grounds for soliciting or analyzing the prosecutor's reasons for all of the disputed strikes, defendant insists we must either reverse the judgment outright, or remand the case to the trial court to conduct such further proceedings. However, no error occurred, and no remedial step of any kind is warranted.[23]

At issue are the requirements for establishing a prima facie case of group bias in the use of peremptory challenges. In this first stage of any *Wheeler/Batson* inquiry, the defendant must show that " 'the totality of the relevant facts gives rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, quoting *Batson, supra*, 476 U.S. 79, 96; accord, *Wheeler, supra*, 22 Cal.3d 258, 280-281.) To clarify, this is not a case in which, after a prima facie violation is found, the prosecution must offer permissible nondiscriminatory

---

[23] Though not mentioned in his briefs on appeal, defendant made six other *Wheeler*/*Batson* motions, all but one of which involved selection of the 12-member jury rather than the six alternate jurors. Such motions concerned the prosecutor's peremptory challenge of persons with various ethnic backgrounds, including V.D., whom defense counsel described as coming "from a Baltic state." Each time, the trial court denied the motion after finding no prima facie case. At one point, the prosecutor complained about the numerous males excused by the defense, including Asian and Hispanic men. The court viewed the latter comment as a "warning" about a possible *Wheeler*/*Batson* motion by the prosecutor — a motion that was never made. (See *Wheeler, supra*, 22 Cal.3d 258, 282, fn. 29 [the People have the same right as a criminal defendant to contest the misuse of peremptory challenges and to obtain an impartial jury drawn from a fair cross-section of the community].) Defendant used 16 peremptory challenges in selecting the actual jury (10 against men and six against women), plus two more challenges in choosing alternates (one against a man and one against a woman).

reasons for the strikes (i.e., the second stage of a *Wheeler/Batson* challenge). Nor must the trial court decide whether the defendant has carried his burden of showing the discriminatory use of such strikes (i.e., the third *Wheeler/Batson* stage). (See *Johnson v. California, supra*, 545 U.S. at p. 168.) Rather, as the trial court correctly assumed below, the prosecutor was not required to disclose reasons for the excusals, and the court was not required to evaluate them, until a prima facie case was made. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1292; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1104-1105 & fn. 3.)

Other core principles guide the manner in which we review a finding that no prima facie case arose under *Wheeler/Batson*. First, in *Johnson v. California, supra*, 545 U.S. 162, the United States Supreme Court reversed *People v. Johnson* (2003) 30 Cal.4th 1302, in which we confirmed that the relevant California standard — even if it sometimes had been expressed as a " 'reasonable inference' " (*People v. Johnson,* at pp. 1312-1313) — was to show that it was "more likely than not" that purposeful discrimination had occurred. (*Id.* at p. 1318.) The high court disapproved this exacting standard for federal constitutional purposes, and said that a prima facie burden simply involves "producing evidence sufficient to permit the trial judge to draw an inference" of discrimination. (*Johnson v. California, supra*, 545 U.S. at p. 170.) Where, as here, it is not clear which standard the trial court used, we independently decide whether the record permits an inference that the prosecutor excused jurors on prohibited discriminatory grounds. (*People v. Carasi, supra*, 44 Cal.4th 1263, 1293; *People v. Zambrano, supra*, 41 Cal.4th 1082, 1105.)

Second, in conducting this independent review and determining whether such an impermissible inference exists, we have the benefit of "the entire record" created on voir dire. (*People v. Yeoman* (2003) 31 Cal.4th 93, 116.) Under settled law, several interrelated circumstances are relevant in this regard, as follows.

50

Contrary to what defendant contends, no prima facie case arose based on the sheer number of peremptory challenges underlying the present *Wheeler*/*Batson* claim. Here, as elsewhere, the " 'absolute size of th[e] sample' " undergoing such scrutiny is " 'small.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 342-343 (*Bonilla*), quoting *People v. Bell* (2007) 40 Cal.4th 582, 597-598.) While no prospective juror may be struck on improper grounds, we have found it " 'impossible,' " as a practical matter, to draw the requisite inference where only a few members of a cognizable group have been excused and no indelible pattern of discrimination appears. (*Bonilla, supra*, 41 Cal.4th at pp. 342-343 [upholding finding of no prima facie case where prosecutor excused two African-Americans, leaving none in the 78-person pool], quoting *Bell, supra*, 40 Cal.4th at pp. 597-598 [same result where prosecutor excused two of three African-American women in the 47-person pool].) Similar concerns prevent us from rejecting the instant ruling simply because the prosecutor excused three women at the start of jury selection.

A broader statistical view also undermines the present *Wheeler*/*Batson* claim. We recently declined to disturb a ruling that no prima facie case arose where our review of the entire record showed that the percentage of prosecutorial strikes in issue did not exceed the percentage by which the relevant group was represented either in the jury pool or on the actual jury that was impaneled. (See *Bonilla, supra*, 41 Cal.4th 313, 344 [finding "no basis at all to infer discrimination" against Hispanics, in general, or Hispanic women, in particular, where prosecutor excused all three Hispanic women from jury pool, and where "Hispanics comprised approximately 10 percent of the pool (eight of 78), the prosecution used 10 percent of its challenges on Hispanics (three of 30), and the final jury was roughly 10 percent Hispanic (one of 12)"].) Indeed, ultimate inclusion on the jury of members of the group allegedly targeted by discrimination indicates " 'good faith' " in the use of peremptory challenges, and may show

51

under all the circumstances that no *Wheeler/Batson* violation occurred.  (*People v. Ward* (2005) 36 Cal.4th 186, 203 [reaching similar conclusion as to numerous prosecutorial strikes against African-American women where "five out of the 12 sitting jurors were African-Americans, and four out of those five jurors were women"]; accord, *People v. Turner* (1994) 8 Cal.4th 137, 168 [same, where prosecutor used four of six peremptories against African-Americans, but "accepted a jury" that, as "ultimately impaneled," included five African-Americans].)

Here, the prosecution's approach to the cognizable group (females) seems even more favorable than in the foregoing cases.  Women comprised 56 percent of the jury pool (42 of 75).  They also represented 72 percent of the first panel called into the jury box (13 of 18), and 68 percent of the same panel after challenges for cause occurred (11 of 16).[24]  By comparison, the prosecutor used a substantially *smaller* percentage of peremptory challenges against women when choosing the actual jury — seven of 14, or 50 percent.  Most telling, however, is that the *vast majority of the final jury was female*, to wit, 10 of 12, or 83 percent.  This figure *exceeds* female representation at any other stage in the process.  Thus, the ultimate composition of the predominantly female jury, along with the relatively modest number of prosecution strikes used against women throughout jury selection, makes it difficult to infer purposeful discrimination under *Wheeler/Batson*.[25]

---

[24]    Women also outnumbered men on all but one of the other six panels called into the jury box to undergo voir dire.  At the high end were the fifth and sixth such groups, which each started with 12 women and six men.  At the other end of the spectrum was the third 18-person group, which held an equal number of women and men, i.e., nine each.  Men never outnumbered women on any panel.

[25]    Not surprisingly, the panel of six alternate jurors was also largely female.  Four of the six, or 66 percent, were women.  Like the defense, the prosecution exercised two peremptory challenges in selecting the alternate jurors, only one of

*(footnote continued on next page)*

Finally, the record contains gender-neutral reasons supporting each of the three peremptory challenges contested on appeal. In explaining her dismissal of M.E., a young Hispanic woman, the prosecutor noted that M.E. disclosed, both orally and in writing, that numerous friends had been killed in violent gang activities; that other friends were confined at the time on serious charges stemming from drive-by shootings, including attempted murder; that her ex-boyfriend was jailed on pending drug charges; and that her brother had been falsely accused by the police of drug possession and was eventually acquitted by a jury of the crime. Such potentially negative contacts with the criminal justice system gave the prosecutor ample reason to excuse M.E. without regard to her gender. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1010-1011 [prosecutor expressed race-neutral grounds for dismissing African-American male whose half brother had been incarcerated, and who reported being stopped by police on false pretenses].)

We likewise see nothing discriminatory in the prosecutor's stated reasons for excusing N.F., a 57-year-old Caucasian woman. This prospective juror stated on voir dire, consistent with her questionnaire, that she had previously served on a jury that deadlocked over "intent" in a felony case. She acknowledged that she was one of the persons responsible for the hung jury, that she felt harassed by other jurors during deliberations, and that she learned from that experience to avoid being swayed by the views of others. When asked by the trial court about imposing the death penalty, N.F. indicated that "intent" could again play a key role in her decision. N.F. further indicated that it might be "easier" to vote for life

_____

*(footnote continued from previous page)*

which involved a woman. Thus, as with the actual jury, the prosecution used only half of its peremptory challenges against female prospective alternate jurors.

imprisonment than for death even where aggravating evidence outweighed mitigating evidence.  In short, we see no gender bias in the prosecutor's express concern about N.F.'s possible close-mindedness and reluctance to impose the death penalty.  (See, e.g., *Bonilla, supra*, 41 Cal.4th 313, 349 [upholding dismissal of female prospective juror who previously served on deadlocked jury, who said she "would adhere to her views" if faced with the same situation again, and who was generally unsure when a death sentence should be imposed].)

We reach a similar conclusion as to T.B., the prospective juror whose peremptory challenge the prosecutor had no chance to explain.  (See *Bonilla, supra*, 41Cal.4th 313, 346-349 [finding gender-neutral reasons in the record for the excusal of numerous female prospective jurors where prosecutor explained only one such strike and trial court found no prima facie *Wheeler/Batson* case]; *People v. Panah* (2005) 35 Cal.4th 395, 439-442 [same].)  On her questionnaire, T.B. identified herself as a young Caucasian woman with a high school diploma who worked in a nonmanagerial job in a bank.  She wrote that she was neither "totally" for or against the death penalty, and that she was "not sure" what punishment was appropriate for defendants who "hurt people."  T.B. told the trial court that despite any uncertainty reflected in her written answers, she was "okay" with deciding the appropriate penalty in a capital case.  However, when the court asked what factors might affect that decision, T.B. said she "couldn't say."  When the prosecutor asked whether she could ever impose the death penalty, T.B. replied, "Well, I'm not — I wouldn't say that I would never say no.  So, I would leave it open that I could say yes to that."  We have found no group bias where the person's views on penalty were as mixed and vague as T.B.'s.  The prosecutor could readily have seen her as "a wild card," and used a peremptory challenge "for reasons unconnected to [her] sex."  (*Bonilla, supra*, 41 Cal.4th at p. 348.)

In light of all these factors, including the nondiscriminatory reasons elicited on voir dire, the trial court properly denied the *Wheeler*/*Batson* motion linked to the peremptory challenges exercised against M.E., T.B., and N.F. As framed both at trial and on appeal, such claim is "particularly weak as it consist[s] of little more than an assertion that a number of prospective jurors from a cognizable group had been excused. Such a bare claim falls far short" of what the law requires to establish a prima facie case. (*People v. Panah*, *supra*, 35 Cal.4th 395, 442.)

## IV. PENALTY ISSUES

### A. Victim Impact Evidence

Defendant claims the trial court erred in admitting victim impact evidence. He asserts violations of his rights to due process, effective representation, and a fair and reliable penalty determination under the Sixth, Eighth and Fourteenth Amendments of the federal Constitution, and under parallel provisions of the state Constitution. No error occurred.

In January 1995, after the guilt verdict was returned and before the penalty trial began, defendant moved orally and in writing to limit victim impact evidence on constitutional grounds similar to those raised on appeal. He also claimed the evidence was unduly prejudicial under Evidence Code section 352. At the hearing on the motion, which occurred at various times on different days, the proffered evidence underwent review. The court and counsel watched the entire videotape, which was prepared by L. around January 1994. Certain parts were then rerun frame by frame. The prosecutor also described, in detail, the testimony, photographs, and documents she sought to present through L. on the stand.

After considering argument on both sides, the trial court denied the motion. The court disagreed with defendant that the victim impact evidence was irrelevant and inflammatory because it was not limited to circumstances occurring "right

55

after the event." The court also rejected defendant's claim that L.'s testimony and the videotape were cumulative. Focusing on specific features in the videotape, the court encountered only two instances of "dramatization," namely, an echo effect heard during the Finzels' wedding ceremony (when Joseph says, "until death do us part"), and the background song about a "hero" and "villain" that played at the end of the videotape. However, the court found that the videotape was not substantially more prejudicial than probative, noting that it seemed "less emotional" than L.'s testimony at the guilt phase. When asked to reconsider its ruling later, shortly before the prosecution began presenting evidence in its case-in-chief, the court declined to do so.

In *Payne v. Tennessee* (1991) 501 U.S. 808, 830 (*Payne*), the United States Supreme Court overruled *Booth v. Maryland* (1987) 482 U.S. 496, insofar as *Booth* barred the admission of victim impact evidence in death penalty cases. *Payne* explained that the state could properly conclude that the jury could not meaningfully assess the defendant's "moral culpability and blameworthiness" unless it was aware of the "specific harm" he had caused. (*Payne,* at p. 825.) *Payne* reasoned that the state has a legitimate interest in " 'counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Ibid*.) Thus, the federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair. (*Ibid*.)

State law is consistent with federal law in this regard. "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of

the crime . . . ."  (*People v. Lewis and Oliver, supra*, 39 Cal.4th 970, 1056-1057, citing *People v. Edwards* (1991) 54 Cal.3d 787, 835-836.)

Defendant first challenges the penalty testimony and related evidence presented by L. because it was not limited to the " 'immediate injurious impact' " of the capital crime, or to effects "known or reasonably apparent" to defendant at the time it was committed.  Under this view, any victim impact evidence that exceeds such bounds is impermissible, particularly where the events occurred "many years before or after the victim's death."

We have rejected similar claims before and do so again here.  (*People v. Lewis and Oliver, supra*, 39 Cal.4th 970, 1057, and cases cited.)  The People are entitled to present a " 'complete life histor[y] [of the murder victim] from early childhood to death.' "  (*People v. Zamudio* (2008) 43 Cal.4th 327, 365.)  Such evidence, which typically comes from those who loved the murder victim, shows "how they missed having [that person] in their lives."  (*People v. Boyette* (2002) 29 Cal.4th 381, 444; see *People v. Verdugo* (2010) 50 Cal.4th 263, 296-299 [many witnesses testified about vibrant lives of two teenage murder victims, and jurors heard songs that one victim finished recording the day she died]; *People v. Taylor* (2010) 48 Cal.4th 574, 645-647 [many witnesses described effects of elderly victim's death on four generations of her family and on community groups with whom she had volunteered]; *People v. Hamilton* (2009) 45 Cal.4th 863, 923-927 [many witnesses described emotional toll of murder on victim's surviving spouse and children over the long 16-year period preceding penalty retrial].)

In the present case, the challenged evidence was presented by a single witness, L. — a direct surviving victim of defendant's violent acts.  She summarized the positive traits, favorite pastimes, close relationships, and future aspirations of her murdered spouse.  In portraying Joseph as a "unique" individual (*Payne, supra*, 501 U.S. 808, 825), L.'s testimony and videotaped evidence took

no more than three hours to present, compared to the multiple days covered by the defense case in mitigation.  The victim impact evidence was not irrelevant or excessive in our view.

We also disagree that certain details were too inflammatory and prejudicial to include in any valid victim impact presentation.  For instance, L. could properly describe the concern Joseph showed in the hospital during Brinlee's birth, including any complications that arose at that time.  Such evidence showed the nature of the family bond, and the corresponding loss of Joseph as a husband and father.  (See *People v. Hartsch* (2010) 49 Cal.4th 472, 508-509 [allowing evidence of extreme hardship experienced by murder victim earlier in his life].)  Nor was the trial court required to exclude evidence concerning Joseph's burial and gravesite.  These circumstances, which paled in comparison to mourning process evidence allowed in other cases, shed permissible light on the family's grief.  (See *People v. Brady* (2010) 50 Cal.4th 547, 570, 579-581 [testimony and videotape of slain police officer's memorial and funeral services, including flag-draped casket in church, attendance by 4,000 uniformed police officers and other mourners, motorcade that stretched for miles, and bagpipe procession to gravesite]; *People v. Verdugo, supra*, 50 Cal.4th 263, 296-297 [testimony and photographs of funeral service of two teenage murder victims, including the release of two doves and a child's act of kissing the coffin]; see *id.* at p. 297 [photographs of birthday observance for slain teenage victim at cemetery several months after murder].)

Finally, defendant claims the trial court erred in admitting the videotape because such evidence contained "special effects" that prejudiced the jury against him.  He complains on appeal, much as he did at trial, about "repeated flashbacks to scenes from Jo[seph] and L[.]'s wedding, a photo montage, including pictures of Jo[seph] as a young boy, one with him fast asleep on a couch next to a sleeping puppy; music; lyrics; echo effects; and voiceovers."

Videotapes may be used for victim impact purposes in capital penalty trials. We have said, however, that trial courts must take care in admitting such evidence, because "the medium itself may assist in creating an [undue] emotional impact upon the jury." (*People v. Prince* (2007) 40 Cal.4th 1179, 1289.) Under this case-by-case approach, we have had little difficulty upholding videotaped tributes to murder victims. (E.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1240-1241 [depicting victim's humble upbringing in Mexico].) Some took more time to play than the present one. (E.g., *People v. Zamudio, supra*, 43 Cal.4th 327, 363-368 [14-minute videotape spanning lives of elderly married couple from childhood to gravesite]; *People v. Kelly* (2007) 42 Cal.4th 763, 794-799 (*Kelly*) [20-minute videotape showing female victim from infancy through age 19, when she died].)

*Kelly* seems highly relevant here. There, the defendant was convicted of robbing, raping, and murdering a 19-year-old woman, Sara, who was a Native American and who had been adopted as an infant into a Caucasian home. At the penalty phase, Sara's mother described Sara's life and the pain her death had caused family and friends. Over defendant's objection, the prosecution also played a 20-minute videotape that Sara's mother had prepared. It consisted of video clips and still photographs spanning Sara's life, with the voice of her mother calmly narrating events in the background. The music of Enya played through most of the video, but the volume was soft and the lyrics were faint. On screen, Sara was seen singing with a school group, including the song, "You Light Up My Life." Other images showed her swimming, horseback riding, and interacting with family and friends. Near the end of the videotape, Sara's mother stated that she does not dwell on the "terrible crime." (*Kelly, supra*, 42 Cal.4th 763, 797.) The video ended with a view of Sara's gravestone, followed by a clip of people riding horseback in Alberta, Canada — the "kind of heaven" in which Sara was said to belong. (*Ibid*.)

59

Rejecting the defendant's contrary claims, *Kelly* held that that because the presentation was relevant and not unduly emotional, it was permissible. (*Kelly, supra*, 42 Cal.4th 763, 797.) We noted that even though the mother's testimony and the videotape covered similar ground, they supplemented, rather than duplicated, one another. The reason was that the videotape "humanized" Sara in a way that live testimony could not do. (*Ibid*.) "In particular, the videotape helped the jury to see that defendant took away the victim's ability to enjoy her favorite activities, to contribute to the unique framework of her family . . . and to fulfill the promise to society that someone with such a stable and loving background can bring." (*Ibid*.)

At most, only two questionable elements emerged — the background music by Enya and the horseback-riding scene from Canada. *Kelly* made clear that such sentimentality is not impermissible as long as it helps show "what [the murder victim] was like." (*Kelly, supra*, 42 Cal.4th 763, 798.) We acknowledged that the challenged features seemed to play a mostly "theatric" role in Sara's case because they imparted little "additional relevant material." (*Ibid*.) However, there was no reason to decide whether the trial court abused its discretion in admitting the videotape with these features intact, because any such error was harmless beyond a reasonable doubt. In making this point, *Kelly* relied on the routine use of music and special effects in videotapes, the factual nature of Sara's videotape overall, and the aggravating nature of the penalty evidence as a whole. (*Id*. at p. 799.)

No different result is warranted here. After reviewing the videotape, we agree with the trial court, which conducted its own careful analysis, that there is nothing objectionable about the manner in which the videotape was edited and prepared. The "flashbacks" to which defendant objects "were simply photographs being shown," in the words of the trial court. The complained-of "voiceover" is L. speaking in a somber, almost flat, tone about scenes from her everyday life with

60

Joseph.  For the reasons discussed above, the images themselves are factual and relevant.  Though L. is seen wiping tears away while describing some of these events, she never loses her composure on tape.

As noted, two audio features caught the trial court's attention — the echo effect accompanying the phrase "until death do us part" in the Finzels' wedding ceremony, and the "hero/villain" song that played during the photo montage at the end of the videotape.  Though more dramatic than factual, these features seem fairly unobtrusive in context, and do not fundamentally alter the subdued tone of the presentation.  In any event, we need not decide whether the contrary is true, because any error was clearly harmless.  For the reasons set forth in *Kelly*, *supra,* 42 Cal.4th 763, and described above, there was "no reasonable possibility these portions of the videotape affected the penalty determination."  (*Id*. at p. 799.)[26]

## B.  Request for Continuance

Defendant contends the trial court erred in denying him a continuance near the end of the penalty trial to present surrebuttal testimony by Dr. Kaser-Boyd.  He claims violations of his right to counsel, to present evidence, to due process and a fair trial, and to a reliable penalty determination under the Sixth, Eighth, and

---

**26**     As noted, Brinlee briefly appeared on the witness stand when L. began testifying at the penalty phase.  (See *ante*, fn. 3.)  Defendant argues here, as he did unsuccessfully below, that there was no need for Brinlee to be seen in court, and that her presence was unduly prejudicial.  However, we see no reasonable possibility that this fleeting event affected the verdict.  Nothing supports defendant's claim that the prosecutor "cradl[ed]" Brinlee in an ostentatious way.  Also, the prosecution showed through testimony, photographs, and videotape evidence that Brinlee was one of two young children whom Joseph, the murder victim, would never be able to see grow up, thus depriving him of the challenges and joys of parenthood.  The jury could not have discerned anything from seeing Brinlee in person that it could not otherwise have inferred from the evidence.

Fourteenth Amendments of the federal Constitution, and under parallel provisions of the state Constitution.[27]  We will reject the claim.

## 1. *Background*

During the People's case-in-chief, and outside the jury's presence, the trial court denied the prosecutor's request to prevent Dr. Kaser-Boyd from testifying that defendant was sexually fondled as a child by his mother Suzanne's first husband, Rudy Garcia.  Contrary to what the prosecutor claimed, the court found sufficient evidentiary support for this incident, namely, information Dr. Kaser-Boyd had obtained from defendant's grandfather, Fred Baumgarte, who saw the fondling.  The court explained that prosecutorial concerns over the details of the incident, and the circumstances under which it was conveyed to Dr. Kaser-Boyd, merely affected "the weight," not the admissibility, of her testimony, and could serve as "ammunition" to challenge her expert opinions in court.  The prosecutor confirmed during the hearing that she planned to "get the grandparents here," meaning, to call both Fred Baumgarte and his wife, Dorothy, as rebuttal witnesses.

---

[27]    The Attorney General argues that defendant never asserted any violation of the federal or state Constitution in seeking a continuance at trial, and therefore has failed to preserve such claims on appeal.  Based on settled law, we disagree.  Here, as in certain other instances in this case, it appears that either "(1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution.  To that extent, defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17, citing *People v. Partida* (2005) 37 Cal.4th 428, 433-439.)  On the merits, no separate constitutional discussion is needed, or given, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory raised for the first time here.

As noted, Dr. Kaser-Boyd testified for the defense that child sexual abuse heightened the risk of criminality and dysfunction in defendant as an adult. She reported being "told" by Fred Baumgarte that defendant was "touched in a sexual way" by Rudy Garcia at age three or four. On cross-examination, Dr. Kaser-Boyd admitted that she had prepared no written report for defense counsel, and that her testimony was based on her memory of interviews with various persons and on her handwritten notes. The witness recalled speaking with the Baumgartes twice — once in person in the presence of their daughter, Suszanne, in August 1994, and once over the phone in December 1994. Dr. Kaser-Boyd also elaborated on the incident that Fred described, namely, its location (at the Baumgartes' home during a visit by defendant's family), its nature (defendant stood on a table while Rudy touched defendant's genitals), and Fred's immediate reaction (a "funny feeling"). Dr. Kaser-Boyd testified that Fred Baumgarte said nothing about Rudy preparing defendant for a bath, and that Fred "is hard of hearing, so interviewing him on the telephone was very difficult."

During the cross-examination of Dr. Kaser-Boyd, the trial court expressed concern over scheduling and the length of the trial. Outside the jury's presence, the court noted that "our time estimate originally is way off, we have lost two alternates, we are down to four . . . [and there is] a lot of restlessness [and] squirming on the part of the jury." The court promised to clear its calendar and to prevent further delay. Counsel were told that jury deliberations should begin soon, preferably that same week.

After Dr. Kaser-Boyd was excused as a witness, the defense rested its case. The prosecutor indicated that she was prepared to begin her case in rebuttal. The trial court expressed its preference for a "short" presentation. After a 10-minute recess, the prosecutor called her first rebuttal witness, Fred Baumgarte.

63

When asked about the fondling incident described by Dr. Kaser-Boyd, Fred Baumgarte testified that he saw defendant at age three or four standing on a table without any underpants, while Rudy held defendant's penis between his thumb and finger. Rudy may have been preparing defendant for a bath, and Fred did not think the touching was sexual at the time. Fred realized that Rudy's conduct was wrong only years later, after listening to media reports about child sexual molestation. Also, Fred recalled that the incident occurred when he and his wife visited defendant's family in their trailer home, rather than when the family visited the Baumgartes' house. Fred further testified that he remembered meeting personally with Dr. Kaser-Boyd in the presence of his wife and daughter, but did not recall talking to the doctor about the fondling incident either in person or on the phone — a point he repeated on redirect examination. On cross-examination, after Fred confirmed he had a hearing problem, defense counsel asked, "Your wife talked to you and then your wife talked back to the doctor?" Fred said, "Yes."

The prosecution's next rebuttal witness was Dorothy Baumgarte, Fred's wife and defendant's grandmother. After the defense sought an offer of proof, the prosecutor stated outside the jury's presence that Dorothy would testify that "she doesn't remember talking to Dr. Kaser-Boyd on the phone." Defense counsel replied that the matter was not in serious dispute and that it would be difficult to return Dr. Kaser-Boyd to court. Nevertheless, Dorothy was allowed to testify that she, along with her husband and daughter, met with Dr. Kaser-Boyd in person before trial, but that Dorothy did not recall ever talking to the doctor about Fred seeing Rudy touch defendant's penis. On cross-examination, Dorothy noted that she suffered anxiety attacks and "wasn't supposed to be on the stand" that day.

After another witness testified on a different matter, the prosecution rested its rebuttal case. Outside the jury's presence, defense counsel sought an unspecified amount of time to locate Dr. Kaser-Boyd to confirm that her

conversations with the Baumgartes did occur. Otherwise, counsel argued, "every single underpinning" of Dr. Kaser-Boyd's testimony and credibility was in doubt.

The trial court denied a continuance to the extent it would "shut down the trial." The court noted that, at most, the jury would infer that "we have two elderly people who really don't remember the conversations." The court also observed that Dr. Kaser-Boyd was on the stand for several days, and that she was thoroughly examined by both parties about her conversations with everyone involved in the case. The court saw no reason to delay trial to rehash what the witness "has already stated."

A discussion then ensued over exhibits and instructions. In the process, defense counsel said he believed that Dr. Kaser-Boyd was present in the courthouse and that he needed time to locate her so that she could testify on surrebuttal. The court did not reject the request. Instead, the court urged counsel to "find her, get her back in here" before closing arguments began.

After a brief recess and further discussions about other matters, counsel conceded that he had been unable to find Dr. Kaser-Boyd and that he again sought a "slight delay" in order to do so. The court declined to grant a continuance, but noted that "if at some point you find her, you can let me know and we will see where we are and if there is something we can do."

After the jury received its instructions, and before the prosecutor finished presenting her closing remarks, the court granted a defense request to admit into evidence Dr. Kaser-Boyd's handwritten notes of her interviews with the Baumgartes. The notes, which appeared on a single sheet of paper, bore the Baumgartes' names, their telephone number, and the date of the telephone call. Dorothy's name was circled, and Fred was said to be hard of hearing. Consistent with the testimony of both Dr. Kaser-Boyd and Fred Baumgarte, the notes further indicated that Fred reported seeing defendant, at age three or four, standing naked

65

on a table while Rudy Garcia touched his private parts.  Thereafter, closing arguments resumed, and the case was submitted to the jury for a penalty decision.

### 2. *Analysis*

Defendant claims the trial court erred in not granting his request for more time to find and call Dr. Kaser-Boyd as a witness, after she was excused by the defense, to rebut the Baumgartes' testimony concerning their contact with her before trial.  Defendant insists he was denied the opportunity to "rehabilitate" Dr. Kaser-Boyd on this issue, and that her credibility suffered as a result.

A criminal trial may be continued only for good cause (§ 1050, subd. (e)), and the trial court has broad discretion in handling the request.  (*People v. Doolin* (2009) 45 Cal.4th 390, 450.)  In determining whether a continuance was properly denied, the reviewing court examines the specific circumstances, including the benefits and burdens of postponing a trial that is already underway.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1125-1126.)  In reality, such challenges rarely have merit or cause reversal of the judgment on appeal.  (*People v. Beames* (2007) 40 Cal.4th 907, 920.)  For several reasons, these standards were not violated here.

First, the trial court did not act arbitrarily in managing the proceedings. The defense was never barred from returning Dr. Kaser-Boyd to the stand. Instead, the court merely declined to grant an open-ended continuance after it became clear that the end of testimony was near, and that the jury was anxious to deliberate.  As defense counsel predicted, between the time that Fred and Dorothy Baumgarte each testified for the prosecution, Dr. Kaser-Boyd could not be located, and no surrebuttal testimony was forthcoming within a reasonable period of time.

Second, no dispute ever arose in connection with the requested continuance as to the substance of the information that Dr. Kaser-Boyd relayed at trial.  The Baumgartes' testimony, along with Dr. Kaser-Boyd's notes, confirmed her account that Rudy Garcia touched defendant's genitals when he was a young boy,

66

that Fred Baumgarte witnessed the event, and that Dr. Kaser-Boyd consulted with the Baumgartes in preparing such testimony. Any impeachment of Dr. Kaser-Boyd concerned purely collateral matters as to the circumstances under which the fondling information was conveyed, and the nature of peripheral details that Fred described at the time. Thus, while the prosecutor questioned in closing argument whether the act Fred saw amounted to "sexual molestation," no claim was made that Dr. Kaser-Boyd exaggerated or fabricated their conversations.

Third, and for similar reasons, no prejudice occurred. Jurors would have understood that even if Dr. Kaser-Boyd misremembered or misstated certain aspects of her conversations with the Baumgartes, the substance of the information she obtained therein and relayed at trial was never in dispute. We find no basis for defendant's sweeping claim that the collateral matters about which he now complains would have fundamentally undermined her credibility about child sexual abuse or about any other matter to which she testified at trial. Hence, even if the trial court had granted a continuance to permit surrebuttal testimony of the kind urged here, there was no possibility of a more favorable penalty verdict.

## C. Prosecutor's Closing Argument

Defendant argues that the prosecutor committed misconduct in closing argument, and thereby violated his due process and confrontation rights, and his right to a fair and reliable penalty determination. These claims rest on the Sixth, Eighth, and Fourteenth Amendments of the federal Constitution, and on parallel provisions of the state Constitution. We disagree.

### 1. *"Animal" References*

The prosecutor spent much of closing argument asking the jury to focus rationally on the aggravating evidence, which she said was "overwhelming", and to impose death because no meaningful basis for mercy in defendant's background

67

or character was shown. After asking jurors to dismiss any suggestion that defendant was not the "worst of the worst" compared to other capital offenders, and reminding them of defendant's calculated violence against the Finzels, the prosecutor insisted he should be held accountable for his "animalistic action." The prosecutor, who was nearing the end of her argument, referred a few more times to defendant as an "animal" and a "predator" who pursued "sadistic passions." Meanwhile, defense counsel objected twice at the bench that such argument was "improper" and constituted "misconduct." Both objections were overruled.

Defendant now insists the prosecutor improperly waged a "personal attack" against him. The challenged remarks allegedly served no purpose other than to "denigrate and degrade" defendant before the jury.

The claim lacks merit. Prosecutorial argument "may include opprobrious epithets warranted by the evidence. [Citation.] Where they are so supported, we have condoned a wide range of epithets to describe the egregious nature of the defendant's conduct." (*People v. Zambrano, supra*, 41 Cal.4th 1082, 1172 [defendant is " 'evil,' a liar, and a 'sociopath' "]; see *People v. Friend, supra*, 47 Cal.4th 1, 84 [defendant is an " 'insidious little bastard,' with 'no redeeming social value,' and being 'without feeling' " or " 'sensitivity' "]; *People v. Farnam* (2002) 28 Cal.4th 107, 199-200 [defendant is a " 'monster,' an 'extremely violent creature,' and the 'beast who walks upright' "].)

Here, defendant broke into the Finzel home late at night, while armed with a gun. One month earlier, he had expressed an interest in raping a woman at gunpoint. The evidence suggested that he stood in the backyard, smoking, and peered through gaps in the bedroom blinds before entering the house. After seeing, perhaps, that L. was the lone adult inside, he waited until her most vulnerable moment to strike — while in bed with a baby by her side. After sexually assaulting and hogtieing L., defendant positioned the bedroom door to

68

ensure that Joseph, whom defendant knew might be arriving soon, would be shot by surprise with his own gun.  Defendant then shot L. to prevent her from summoning help.  He stayed in the house for hours collecting valuables, repeatedly checking on her condition and waiting for her to die.  The property he stole from the couple included the wedding ring on Joseph's finger and anything else found in his turned-out pockets as he lay dead or dying on the floor.

The epithets used by the prosecutor were not unreasonable or unfair in light of this evidence.  We therefore conclude no misconduct occurred.

### 2.  *Victim "Letters"*

Near the end of closing argument, the prosecutor referred to defense evidence at the penalty phase showing that defendant had "two fathers" — his "stepfather," Rudy Garcia, and his "real father," Patrick Grandchampt — with whom he could communicate.  Jurors were reminded that defendant had deprived Garrett and Brinlee, as youngsters, of the same benefit by murdering their father, Joseph.  The prosecutor asked the jury to consider the emotional pain Garrett felt after his father's murder.  Referring to the letters that defendant wrote during trial to Patrick Grandchampt, the prosecutor also asked jurors to imagine how Garrett might describe such pain "if he could write a letter" to his father.  Defense counsel sought a bench conference, and insisted that any reference to a hypothetical letter from Garrett was improper.  The court overruled the objection, and prosecutorial argument resumed.[28]  The prosecutor then asked jurors to consider what Brinlee

---

[28]    The hypothetical Garrett letter was delivered, in full, as follows:  "Dear Dad, I love you very much.  I miss you so very much.  I know some day I'll see you again.  But in the meantime, I remember how you were my best buddy, how you tucked me in at night, how we played together, camped together, and how you wanted to ride motorcycles together with me, and how you and Mom included me in everything.  I remember the wedding.  And I remember Christmas's [*sic*] with

*(footnote continued on next page)*

might say if she "could write" a similar letter to Joseph, whom she had never known.[29]

On appeal, defendant complains that the prosecutor served only to stir the passions of the jury by asking them to place themselves in the position of the murder victim's children and to judge defendant harshly.  He also suggests that

---

*(footnote continued from previous page)*

you.  I remember when you and Mom took me to my first day of school.  You were always there, Dad.  Then Randy Garcia took you away from me one weekend when I was visiting my real mother.  I never got to say good-bye to you, Dad.  That hurts real bad.  My heart aches so much I think it's worse than any pain I will ever know.  Now you will never take me to school again.  You will never come and watch any games I play, baseball, basketball, soccer, football.  You will never see me graduate from elementary school, junior high school, high school, or college.  I won't have you to give me the kind of advice a dad gives his son while growing up.  How will I talk to my mother about girls and boys kind of stuff?  You will never be able to meet the woman that I marry.  She won't even know you.  And that breaks my heart, Dad.  And it hurts so badly that my children will never know their grandfather.  And what a wonderful grandfather you would have been.  But the thing that hurts the worst, and it hurts every day and I cry every day, I will never see you during my life here on earth, a life that could be very long.  I will miss you, Dad, and I'll think of you every day.  I know you know how much I miss you because I know you miss me in the same way.  So until we meet, Dad, I love you with all my heart."

[29]  The hypothetical Brinlee letter was delivered, in full, as follows:  "Dad, I am so sorry that I never even got to know you.  I will only get to know you from photographs and stories that Mom and other people tell me about you.  I will only know you from videos and things that Mom had saved, but I know how much you loved me.  I can tell from those stories and from those photographs.  Mom's made it clear how much you loved me.  I wish I even had one hour with you that I could remember.  But I have no memories at all because Randy Garcia took your life as I lay by you in my bassinet.  I will never have you to walk me to school at all.  I will never have you to walk me down the aisle and to give me away at my wedding.  You will never know my children.  Dad, why does Randy Garcia get to meet his dad and have a relationship with him when I'll never get that same opportunity?"

jurors were thereby invited to speculate about irrelevant future events, and to consider matters outside the trial record.

In closing argument, prosecutors have wide latitude in asking jurors to draw reasonable inferences from the evidence. (*People v. Lewis and Oliver, supra*, 39 Cal.4th 970, 1061.) Along these lines, "it is proper at the penalty phase for a prosecutor to invite the jurors to put themselves in the place of the [murder] victims and imagine their suffering." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1212; see *People v. Dykes* (2009) 46 Cal.4th 731, 793-794 [jurors asked to consider how murder victim felt in having " 'a hot piece of lead tear through his chest, go through his heart, his lungs, his liver and come out his back' "].) The same principle extends to the "unique pain" experienced by family members who are left to grieve the murder victim's death and to experience the loss of that person in daily life. (*People v. Stitely* (2005) 35 Cal.4th 514, 568 [prosecutor encouraged jurors to empathize with both the murder victim, who was a "wife and mother," and with the family who survived her].)

We do not necessarily condone the particular tactic used by the prosecutor here. But, under relevant law, no constitutional error or prosecutorial misconduct occurred. The prosecutor made clear that the words and thoughts attributed to Garrett and Brinlee had not actually been written or uttered by them. Instead, the "letters" presented orally in court were obviously being used as a rhetorical device to highlight what the children "could write" about the capital crime.

Moreover, the substantive point being illustrated was permissible under the victim impact principles set forth above. Jurors were simply asked to draw reasonable inferences from evidence of the family's close relationship and favorite activities about the long-term effects of Joseph's murder on his children. Indeed, having threatened Brinlee in her bassinet and peered into Garrett's bedroom, defendant knew about both children when he fatally shot their father and tried to

71

kill their mother. The "letters," which were not particularly artful, contained no information that could not otherwise have been properly conveyed to the jury. Hence, we reject the present misconduct claim.

### D.  Victim Impact Instruction

Defendant argues that the trial court erred in failing to instruct sua sponte on the proper use of victim impact evidence. He alleges violations of his rights to due process and a reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments of the federal Constitution, and under parallel provisions of the state Constitution. No error occurred.

At the penalty phase, the trial court gave standard instructions defining the aggravating and mitigating factors (CALJIC No. 8.85), describing the process of weighing such factors in order reach an appropriate penalty verdict (CALJIC No. 8.88), and prohibiting jurors from being influenced by bias or prejudice against the defendant or swayed by public opinion or public feelings. (CALJIC No. 8.84.1.)

Relying solely on out-of-state cases, defendant insists the trial court should have given an additional instruction on its own motion, as follows: "Victim impact evidence is simply another method of informing you about the nature and circumstances of the crime in question. You may consider this evidence in determining an appropriate punishment. However, the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual. Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence. Finally, a victim-impact witness is precluded from expressing an opinion on capital punishment and, therefore, jurors must draw no inference whatsoever by a witness's silence in that regard."

72

However, we have previously considered similar claims regarding a substantially similar instruction, and have concluded that it need not, and should not be given. (*People v. Zamudio, supra*, 43 Cal.4th 327, 368-370; accord, *People v. Tate* (2010) 49 Cal.4th 635, 707-708; *People v. Carrington, supra*, 47 Cal.4th 145, 198; *People v. Bramit, supra*, 46 Cal.4th 1221, 1244-1245.) Several reasons exist. First, to the extent it accurately describes victim impact evidence as a relevant circumstance of the capital crime and allows its consideration in the penalty decision, the proposed instruction "would not have provided the jurors with any information they did not otherwise learn" from standard penalty instructions properly given by the court. (*People v. Zamudio, supra*, 43 Cal.4th at p. 369.) Second, the proposed instruction is misleading and "incorrect" insofar as it suggests that the jury may not consider, or be affected by, sympathy for the murder victim and bereaved family members. (*Ibid*.) Third, the rest of the proposed instruction, advising jurors that the law does not deem one victim's life more valuable than another and cautioning them against drawing any inference from a victim impact witness's silence on capital punishment, is "not necessary to the jury's understanding" of the case. (*Id*. at p. 370.)

We adhere to these principles and authorities, and reject defendant's instructional claim.

### E. Constitutional Challenges to Death Penalty Law

Defendant raises numerous challenges to the death penalty law under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and to the manner in which it was applied to him. He mainly seeks to preserve and litigate such issues later. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303-304.) As defendant concedes, we have rejected all such claims before. We do so again here, as follows:

73

Section 190.3, factor (a), allowing consideration of the circumstances of the capital crime, does not license the arbitrary and capricious imposition of the death penalty. (*People v. Gamache* (2010) 48 Cal.4th 347, 406, and cases cited.)

The death penalty law, and standard instructions based thereon, are not flawed insofar as they fail to require proof beyond a reasonable doubt as to whether (1) aggravating factors were present, (2) the aggravating factors outweighed the mitigating factors, (3) the aggravating factors were so substantial as to warrant a death sentence, or (4) death is the appropriate penalty. Nor were written findings or unanimity as to aggravating factors required. High court decisions, such as *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, and *Apprendi v. New Jersey* (2000) 530 U.S. 466, do not undermine these conclusions. (*People v. Bell, supra*, 40 Cal.4th 582, 620, and cases cited; *People v. Anderson* (2001) 25 Cal.4th 543, 589, and cases cited.)

There is no constitutional requirement to instruct either on any burden of persuasion regarding the penalty determination, or on any presumption that life without the possibility of parole is the favored or appropriate penalty. (*People v. Taylor, supra*, 48 Cal.4th 574, 662, and cases cited.)

Standard instructions are not flawed insofar as they allow a death verdict if aggravation is "so substantial" compared with mitigation, such that death is "warranted." (*People v. Russell* (2010) 50 Cal.4th 1228, 1273.) A jury so advised need not also be told that life without parole is (1) mandatory if mitigation outweighs aggravation, or (2) permissible even if aggravation outweighs mitigation. (*People v. Tate*, *supra*, 49 Cal.4th 635, 712, and cases cited.)

Under the relevant law and instructions, the trial court did not err insofar as it failed to (1) delete assertedly inapplicable sentencing factors, (2) instruct as to which sentencing factors are aggravating and which are mitigating, or (3) instruct that the absence of mitigation in certain statutory categories was not aggravating.

(*People v. Stitely, supra*, 35 Cal.4th 514, 574, and cases cited.)  Use of the terms "extreme" and "substantial" to describe certain mitigating factors is not impermissible.  (*People v. DePriest, supra*, 42 Cal.4th 1, 60, and cases cited.)

California's automatic appeals process is constitutional even though it affords no intercase proportionality review.  (*People v. Anderson, supra*, 25 Cal.4th 543, 602.)  Equal protection does not require that capital defendants be afforded the same sentence review as other felons to whom the determinate sentencing law applies.  (*People v. Brady, supra*, 50 Cal.4th 547, 590.)  Elimination of capital punishment in California is not required under international law or norms.  (*People v. Solomon, supra*, 49 Cal.4th 792, 844, and cases cited.)

### F.  Cumulative Error and Prejudice

Defendant complains about the cumulative effect of alleged errors at his penalty trial.  We have individually rejected his claims of error and/or have found any assumed error to be nonprejudicial.  Such claims are no more compelling or prejudicial when considered together, even assuming (as defendant does) that the beyond-a-reasonable-doubt standard in *Chapman v. California* (1967) 386 U.S. 18, applies.  We will not reverse the death judgment on this ground.

## V. DISPOSITION

The judgment is affirmed in its entirety.

**BAXTER, J.**

**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
KANE, J.*

_____
\*      Associate Justice, Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY KENNARD, J.**

I join in affirming defendant's judgment of death. I write separately because, although I agree with the majority that defendant's challenge to the grand jury selection process lacks merit, I reach that conclusion by using a somewhat different analysis.

In June 1993, the Grand Jury of Los Angeles County returned an indictment charging defendant with, among other things, the murder of Joseph Finzel. Thereafter, defendant moved in superior court to dismiss the indictment, alleging that the process used to select the grand jurors discriminated against women and Hispanics in violation of the equal protection guarantee of the federal Constitution's Fourteenth Amendment. The trial court held a hearing at which both the prosecution and defendant submitted evidence, after which the court denied the motion. On this appeal, defendant argues that the trial court erred in so ruling.

Although the prosecutor argued in the trial court that defendant's equal protection claim is controlled by the United States Supreme Court's decision in *Duren v. Missouri* (1979) 439 U.S. 357, in this court the Attorney General has conceded that the controlling authority is the high court decision in *Castaneda v. Partida* (1977) 430 U.S. 482 (*Castaneda*). I agree that *Castaneda* controls, as does the majority.

Under *Castaneda*, a defendant raising an equal protection claim regarding the selection of grand jurors must make a prima facie case of purposeful discrimination. "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. [Citation.] Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. [Citations.] . . . [A] selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. [Citation.] Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut the case." (*Castaneda*, *supra*, 430 U.S. 482, 494-495.)

Here, the majority says it is "not entirely certain of the elements of a prima facie equal protection violation." (Maj. opn., *ante*, at p. 34.) Because of this uncertainty, the majority declines to determine whether defendant made a prima facie case of purposeful discrimination as to either women or Hispanics. (*Id.* at p. 37.) I do not share the majority's uncertainty about the elements of a prima facie case. As the quotation in the previous paragraph shows, the prima facie case has two elements — the existence of a distinct, identifiable class, and a statistical showing of substantial underrepresentation over a significant period of time. (*Castaneda*, *supra*, 430 U.S. 482, 494-495.) Proof of these two elements raises a presumption of discriminatory purpose, thereby shifting the burden of proof to the prosecution. Evidence that the selection procedure is "susceptible of abuse" or "not racially neutral," although not required as an additional element of the prima facie case, "supports the presumption of discrimination raised by the statistical showing." (*Id.* at p. 494.)

2

Both women and Hispanics form distinct, identifiable classes for purposes of equal protection analysis, so it is undisputed that defendant here established the first element of the prima facie case. (See maj. opn., *ante*, at p. 36 [stating that "the first prong of *Castaneda*'s 'prima facie' test is met"].) Regarding the second element, the statistical showing of underrepresentation, the majority does not decide whether defendant presented sufficient evidence. (*Id*. at p. 37.) I conclude that defendant's statistical showing was sufficient as to Hispanics but not as to women.

Regarding women, the record shows that from 1986 to 1994, 41.2 percent of the grand jury nominees in Los Angeles County were women, while women constituted 50.6 percent of the population. This translates to an absolute disparity of 9.4 percent, which is insufficient to raise an inference of purposeful discrimination. (See *Swain v. Alabama* (1965) 380 U.S. 202, 208-209 ["We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%."]; see also *People v. Ramos* (1997) 15 Cal.4th 1133, 1156 [citing numerous decisions finding similar absolute disparities insufficient].) For this reason, I conclude that defendant failed to establish a prima facie case of purposeful discrimination against women in the selection of grand jurors in Los Angeles County during the relevant time period from 1986 to 1994.

Regarding Hispanics, the record shows that from 1986 to 1992, only 6.6 percent of the grand jury nominees in Los Angeles County were Hispanics, while voting-age Hispanic citizens who spoke at least some English constituted 19.1 to 19.4 percent of the population. These numbers reveal an absolute disparity around 12.7 percent and a comparative disparity around 60 percent. Considering both absolute and comparative disparities (see *Berghuis v. Smith* (2010) __ U.S. __ [130 S.Ct. 1382, 1393] [recognizing that both tests are "imperfect"]; *People v.*

3

*Burgener* (2003) 29 Cal.4th 833, 860 [considering both absolute and comparative disparities]), I conclude that defendant made a sufficient statistical showing to raise a presumption of discriminatory purpose.

This presumption was supported by evidence that, when the grand jurors who returned the indictment against defendant were selected, Los Angeles County used a grand juror selection system that was "susceptible of abuse" (*Castaneda*, *supra*, 430 U.S. 482, 494) in the sense that the judges who nominated the grand jurors were given complete discretion and were not required to explain or justify their nominating decisions. Persons wanting to serve on the grand jury were required to fill out an application that asked them to identify their gender and their "race or ethnic derivation." Applicants were then interviewed and rated by a panel of trial judges. After reviewing the applications, which revealed which applicants were Hispanic, and the ratings of the interview panel, each trial judge had complete discretion to nominate two persons who met the minimum statutory requirements. Using this system, had they been so inclined, any or all of the judges *could* have purposefully discriminated against Hispanics or members of other racial or ethnic groups.

Nevertheless, despite the *potential* for abuse inherent in the system, I agree with the majority that the prosecution adequately proved that the underrepresentation of Hispanics on the grand jury did not result from any purposeful discrimination. Particularly persuasive is the evidence that (1) substantial efforts were made to persuade members of the Hispanic community to apply for grand jury service; (2) from 1986 to 1991, the percentage of Hispanic applicants was identical to the percentage of Hispanics nominated for the grand jury, showing that the nomination process did not reduce Hispanic representation; and (3) during the same period, trial judges nominated 73 percent of the interviewed applicants who identified themselves as "Hispanic," compared to only

4

46 percent of interviewed applicants who identified themselves as "Caucasian." Thus, I agree with the majority that the trial court did not err in denying defendant's motion to quash the indictment.

On this basis, I concur in affirming the judgment.

KENNARD, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Garcia

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S045696
**Date Filed:** August 25, 2011

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Jacqueline A. Connor

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Peter R. Silten, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, John R. Gorey, Sharlene A. Honnaka and Russell A. Lehman, Deputy Attorney General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Peter R. Silten
Deputy State Public Defender
221 Main Street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Russell A. Lehman
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2280